Stanley R. KIELMAR and Carol J. Kielmar, et al., Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Nos. 88–2637 to 88–2642 and 88–2649 to 88–2652.

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1989.

Decided Aug. 28, 1989.

Milton A. Levenfeld, Alan F. Segal, Michael J. Tuchman, Levenfeld, Eisenberg, Janger, Glassberg, Genson & Lippitz, Chicago, Ill., for petitioners-appellants.

Richard Farber, Gary R. Allen, William S. Rose, Jr., Asst. Atty. Gen., Kenneth L. Greene, Dept. of Justice, Tax Div., Appellate Section, Charles S. Casazza, William F. Nelson, I.R.S., Washington, D.C., for respondent-appellee.

Before BAUER, Chief Judge, WOOD, Jr., Circuit Judge, and WILL, Senior District Judge.[*]

WILL, Senior District Judge.

This is an appeal from a decision of the United States Tax Court that taxpayers' option trades on the London Metals Exchange lacked economic substance and that taxpayers could not, therefore, deduct their losses on those trades. We have already addressed this matter in *Yosha v. Commissioner*, 861 F.2d 494 (7th Cir.1988), but the present appellants allege that they were denied an opportunity to present evidence as to their trades which distinguished them from the other taxpayers whose cases were consolidated before the Tax Court. The decision of the Tax Court that the taxpayer-petitioners' trades lacked economic substance was published as *Glass v. Commissioner*, 87 T.C. 1087 (1986) and was affirmed by *Yosha*. For the reasons set forth herein, we affirm the Tax Court's decision.

## I. Factual Background.

### A. London option transactions.

The *Glass* cases dealt with a tax savings scheme relied on by a group of some 1400 taxpayers between 1976 and 1980. This scheme took advantage of the IRS private letter rulings in the early 1970s which stated that the closing of "bought options" resulted in a capital gain or loss while the closing of "sold options" resulted in an ordinary gain or loss. As a result, many persons carried out London option transactions involving a two-year series of trades in options and forward contracts which resulted in allegedly ordinary losses in the first year and approximately off-setting capital gains in the second year. The transactions also shared the characteristic that they were "zeroed out," or closed out, with little or no net gain or loss. These transactions were brokered mostly by six firms, including Rudolf Wolff and Company, Ltd. and Competex, S.A. (the firms used by appellant-taxpayers).

### B. Tax court proceedings.

The cases of all of the appellant-taxpayers ("Taxpayers"), with the exception of

[*] The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, Eastern Division, is sitting by designation.

James and Debra Kruger[1], were consolidated with all the other *Glass* cases and grouped around the firms through whom they traded. The Taxpayers filed a motion on January 30, 1981 requesting that their cases be grouped separately from the others for pretrial and trial purposes, but that motion was denied on July 20, 1982. The Tax Court set January 31, 1983 as the date for the trial of the consolidated cases to begin. Several test cases were to be chosen representing the various trading patterns. In its order setting the trial date, the court also noted that evidence "relating to profit motive or intent will be taken at a subsequent time, possibly following a deconsolidation of this proceeding." Pretrial Order No. 6, at 2 (June 24, 1982). Again, in an order dated March 4, 1983, the Tax Court indicated that the cases would later be deconsolidated. Pretrial Order No. 11, at 6.

On August 12, 1983, the Taxpayers filed another motion to sever in order to develop evidence which related solely to them, but the Tax Court—in light of the fact that one of the Taxpayers had agreed to testify with regard to his profit motive—decided that the motion was moot. At the end of the third trial session the court went ahead and took evidence as to the profit motive of some of the taxpayers without deconsolidating. One of the Taxpayers, Marvin Lipschultz, testified at the hearing in response to the questions of the lead counsel chosen by the court. The Tax Court issued its decision on November 17, 1986 in favor of the Commissioner, and on December 17, 1986, the Taxpayers moved for reconsideration alleging that certain findings of fact did not apply to them. This motion was denied on February 18, 1988 by a Memorandum Sur Order. On March 18, 1988, the Taxpayers filed yet another motion for reconsideration, which was denied.

The *Glass* opinion filed on November 17 summarizes the evidence as to the various firms and the types of trades made by the petitioning taxpayers. In addition, the opinion summarizes the Commissioner's argument that the presence of four factors in all of these trades shows that they were sham transactions. Those factors were: "artificial pricing, arbitrary fixing of commissions, artificial contangos, and failure to require or maintain margin." 87 T.C. at 1159.

The court noted, when it turned to the question whether the London option transactions lacked economic substance, that "we are here focusing our attention not on questions of fact but on a question of law. If section 1234 losses are allowable under a paradigm set of facts as postulated by petitioners, then the question of whether petitioners have introduced enough evidence to prove that the transactions are authentic becomes moot." *Id.* at 1172. Considering a paradigm for the entire scheme, the court found in every case a "sold option in year one with an ordinary loss objective and the moving of the offsetting capital gain to a subsequent year." *Id.* at 1174.

The court found that although early losses in a business scheme did not always destroy the overall profit objective, these cases were different. Here the taxpayers *intentionally* incurred losses in the first year. This was shown by the fact that if they had not in every case entered into closing transactions on sold options in year one, they could have made a profit. In other words, there was a potential way to make a profit, but these taxpayers avoided it by intentionally realizing losses in the first year which "were not necessary or helpful in profiting from difference gains in petitioners' commodity straddle transactions." *Id.* at 1176. From that, the court inferred that there was no economic substance to the transactions other than the tax benefits. There was, therefore, no rea-

1. The cases of *James and Debra Kruger v. Commissioner* and *James Kruger v. Commissioner* were filed in the Tax Court after the consolidation was closed and were dismissed after their counsel represented that they would be bound by one of the consolidated cases which had been decided in the Commissioner's favor. We, therefore, consolidated the Kruger appeals with the consolidated cases.

son to consider any other evidence of a profit motive.

The Seventh Circuit review of the Tax Court opinion, *Yosha v. Commissioner,* 861 F.2d 494 (7th Cir.1988),[2] includes a similar analysis to that of the Tax Court. The Tax Court opinion was approved on the basis that it was not clearly erroneous to find that there was no economic substance to the transactions both because they were entered into without placing the taxpayers at any risk and because there was little or no prospect of a trading profit as a result of the way they were structured. *Id.* at 500, 502.

### C. The Taxpayers' trades.

The Taxpayers made option trades through two companies, Nonferrous Metals Company ("Nonferrous") and Export International, Inc. ("Export"), which were both managed by Marvin Lipschultz. Lipschultz had substantial trading experience with the Chicago Board of Options Exchange and other commodity exchanges, but had never traded on the London Metals Exchange ("LME") until 1975. In November of 1975, he went to London to seek help in entering into the commodities business on the LME on behalf of the Taxpayers. He chose Butler, an options specialist at the Rudolf Wolff firm.

Lipschultz subsequently had the Taxpayers sign a joint venture agreement and contribute margin deposits in proportion to their interests. As of mid-1976, the option and forward contract trades produced a gain for Taxpayers. However, this gain was wiped out before the end of the year by some losing trades and currency transactions. Butler had, contrary to instructions from Lipschultz, engaged in currency hedging. In a letter to Lipschultz, Butler admitted to the hedging and then noted that "this worked out reasonably satisfac-

torily in the end result," even though the ending balance of the account which resulted was only $48. In mid–1976, Lipschultz was forced to find another broker because the Wolff firm got out of the London options business and went to James Gourlay, the manager of Competex at the recommendation of Butler. The final result of the trades through Competex was a loss not in excess of the deposits made.

The details of the arrangements with Butler and Gourlay which allegedly set the Taxpayers apart from the other taxpayers in the *Glass* case are as follows. First, Lipschultz considered several possible brokers before deciding on Butler at the Wolff firm. Second, although Butler was legally free to make discretionary trades, Butler had agreed that Lipschultz could make suggestions about trading strategy and Lipschultz in fact did make suggestions. Lipschultz made numerous calls to Butler regarding his trading activity. Lipschultz also sent letters to Butler asking him to reexamine his strategy in order to make greater profits.

A third difference noted by Taxpayers is based on documentary and testimonial evidence that none of their risks of loss was limited to their margin deposits as was the risk of other taxpayers through so-called stop-loss arrangements. In addition, they later paid in additional sums through Competex, which they understood to be additional margin calls, although the government contends that these were simply payments toward the original margin account agreed to by the Taxpayers.

### II. Analysis.

 The Taxpayers allege that they were denied due process of law when the Tax Court denied their requests to be represented by separate counsel (rather than lead counsel), to present additional evidence

---

**2.** Several other circuits have affirmed the *Glass* decision. *See Dewees v. Commissioner,* 870 F.2d 21 (1st Cir.1989); *Friedman v. Commissioner,* 869 F.2d 785 (4th Cir.1989); *Keane v. Commissioner,* 865 F.2d 1088 (9th Cir.1989); *Ratliff v.* *Commissioner,* 865 F.2d 97 (6th Cir.1989); *Killingsworth v. Commissioner,* 864 F.2d 1214 (5th Cir.1989); *Kirchman v. Commissioner,* 862 F.2d 1486 (11th Cir.1989).

as to their profit motives and to brief separately the facts which allegedly distinguished them from the other *Glass* taxpayers and that, as a result, we should remand their cases for a new hearing. In addition, they argue that, even if we do not remand for a full hearing, we should remand for recomputation of the tax deficiencies in some cases. We disagree with Taxpayers' allegations and affirm the Tax Court's decision.

Taxpayers do not cite any cases for the proposition that they were denied due process by the manner in which their cases were handled, but only cite cases which uphold a trial court's discretion in consolidation decisions. In one of the cited cases, *American Employers' Insurance Company v. King Resources Company*, 545 F.2d 1265, 1269 (10th Cir.1976), the reviewing court affirmed the trial court's discretion to deny a request to consolidate. Nevertheless, it is well established that due process requires a meaningful hearing before someone may be deprived of a significant property interest. *See Edelberg v. Illinois Racing Bd.*, 540 F.2d 279, 284–85 & n. 9 (7th Cir.1976).

The Taxpayers argue that their cases were different from the others and that they were therefore given no hearing on the facts of *their* cases, i.e., no meaningful hearing. They argue that they were denied "an opportunity to present objective evidence of their intent to profit and that they profited in fact," and that they did not have "their day in court." Brief of Petitioners–Appellants at 13, 17.

We note first that the four factors which the Taxpayers argue were incorrectly applied to them—artificial pricing, arbitrary fixing of commissions, artificial contangos and failure to require or maintain margin—were the factors supplied by the Commissioner to show that the transactions were shams. *Glass*, 87 T.C. at 1159–60. The Tax Court, however, did not explicitly rely on these factors in reaching its conclusions.

The pattern that the Tax Court relied on was one of intentionally incurred losses in year one, leaving any possible capital gain for year two. (*See* discussion above at p. 962). Taxpayers have not shown that that pattern did not apply to them as it did to the others before the Tax Court. Taxpayers argue that the fact that they completed both legs of their 1976 trade in 1976 in the great majority of cases "belies the existence of a tax loss trading strategy that would create ordinary losses in 1976 and capital gains in 1977." Brief of Petitioners–Appellants at 43. However, they admit that they "incurred net losses from closing transactions on options in 1975 or 1976 as a result of commodity option and forward trading on the [London Metal Exchange]...." *Id.* at 7; *see also* Exhibit R–1568–1 (showing trading pattern followed by Taxpayers through Nonferrous).

It is not clear why the fact that Taxpayers, in many cases, closed both legs of their transactions in the first year makes a difference, so long as they were intentionally incurred in the first year of their trading. If they are referring to the use of a forward contract straddle to convert a short-term capital gain to a long-term capital gain by waiting several months to close out the gain leg of the forward contract straddle, then we do not see how the fact that Taxpayers failed to get the best possible tax benefits (by achieving long-term capital gain treatment) should change the Tax Court's basic conclusion that the trades were shams. Because the trades of Taxpayers follow the paradigm relied upon by the *Glass* court, the fact that Taxpayers here differ somewhat from the others with regard to these four factors alleged by the Commissioner is of no account.

In addition, the Taxpayers note three ways in which their trades differed from the fact patterns discussed by the court. They are: the use of finders by the other taxpayers, the fact that the other taxpayers had discretionary accounts whereas Taxpayers (through Lipschultz) allegedly exerted some control over the trading activity, and the fact that other taxpayers used stop-loss arrangements whereas Taxpayers did not. Nevertheless, again these factors were not central to the Tax Court's decision as to the lack of economic substance in the paradigm transaction but were addi-

tional evidence that these transactions, as regularly carried out, were shams. In general, the Taxpayers attempt to show that they retained control over the trading on their accounts and that they were at risk. However, the evidence shows that Taxpayers used two of the six major firms for London option trading, that Butler was in fact free of any legal constraints on trading activity, that he, in fact, used his discretion and that, although Taxpayers may have been at some risk, in practice the trades were made so that no one lost more than his original margin account. *See Yosha*, 861 F.2d at 500–01. Even the facts as alleged (and not proved) by Taxpayers do not show that their cases were different in any relevant way from the other *Glass* cases.

The Taxpayers object that the Tax Court relied on the Commissioner's Exhibit 1568, which was not entered into evidence until the last day of trial three weeks after Lipschultz had testified. As a result, they contend that they were not given an opportunity to challenge its accuracy as it applied to them. *See* Brief of Petitioners–Appellants at 30. Taxpayers' argument is off the mark for two reasons. First, the lead counsel representing them was able to challenge the exhibit's accuracy. Second, the factual differences alleged by Taxpayers in their cases from the summary of information in Exhibit 1568 are irrelevant to the paradigm situation relied on by the Tax Court for the same reasons mentioned above. In sum, they allege that their positions were more speculative than the other Wolff customers and reallege the other ways already mentioned in which their trades differed. Brief of Petitioners–Appellants at 31–35. Again, we find no merit to their challenge based on these alleged factual differences.

There are two other forms of objections raised by the Taxpayers. They argue that the losses in their London option transactions were caused, for the most part, by currency losses and not losses because of trades. They argue that, but for the currency losses, they would have shown a net profit. However, the Tax Court apparently found that the currency losses incurred by

the Taxpayers were no different from the trading losses incurred by the other taxpayers, since in either case the accounts were zeroed out. The Tax Court found that the letter from Butler explaining his decision to do currency hedging "gave the game away," when he wrote that his change of strategy "worked out reasonably satisfactorily in the end result." Memorandum Sur Order at 15. The only explanation that the court could find for this letter, when the hedging had resulted in a loss of all but forty-eight dollars in the account, was that the Taxpayers' desired result was to zero out by whatever means necessary. The Tax Court, based on the documentary evidence before it, determined that none of the alleged differences in the Taxpayers' cases set them outside the paradigm on which the court's opinion was based.

The Taxpayers argue that the fact that their returns showed the same pattern of losses and gains as the paradigm on which the court relied is not sufficient, because such analysis would mean that "every commodities trader that took a loss in year one, realized a gain in year two and in short order determined that the enterprise was not worth pursuing would be denied a deduction for his losses." Reply Brief at 5, n. 8. However, the Tax Court's holding was not nearly so broad, but was limited to the paradigm as it applied to London option trades. The court wrote that in the commodity options and futures trade in which it is difficult to profit from difference gains, "the intentional skewing of transactions to realize year one losses introduces an additional negative element which prohibitively stacks the deck against chances of significant financial success." 87 T.C. at 1174. *See Yosha*, 861 F.2d at 502.

Because the pattern of Taxpayers' trades showed that there was no economic substance to them, it was not necessary for the Tax Court to consider additional evidence about the circumstances of their trading which would have supported their argument that they acted with a profit motive. *Forseth v. Commissioner*, 845 F.2d 746, 748 (7th Cir.1988). Taxpayers, therefore, were not denied their due pro-

cess rights to a meaningful hearing, because there was no hearing as to the facts showing their intent. For the same reasons, Taxpayers were not denied due process because their requests for separate counsel and separate briefing were denied.

■ Finally, Taxpayers argue that even if we deny their request for another hearing, their cases should be remanded for Rule 155 computations. They allege, as an example, that the Commissioner "failed to back out *all* London option transactions from the Glicks' 1976 return." Reply Brief at 14. The Taxpayers' argument is that they were denied a deduction for their losses due to London option trades in 1976 and that they should not, therefore, have been taxed for their gains. However, the duty of consistency applies here as it did on the virtually identical facts of the case of *Herrington v. Commissioner*, 854 F.2d 755 (5th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989).

The duty of consistency applies when there have been: "(1) a representation or report by the taxpayer; (2) on which the Commission has relied; and (3) an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner." *Id.* at 758. The Glicks, as part of the Lipschultz Petitioners, executed trades in 1975 through Rudolph Wolff & Co. on which they declared ordinary losses. *See* Motion to Sever, Regroup and Appoint Lead Counsel, Petitioners' App. B1, pp. 3, 6 (showing that Glicks were part of Lipschultz Petitioner group which made trades in 1975 through Wolff) and *Glass,* 87 T.C. at 1144 (showing ordinary loss of representative Wolff petitioner in 1975).

The Glicks, like the Herringtons, had apparently deducted their 1975 losses from London market trades and also declared their 1976 capital gains. On April 2, 1980, when the Commissioner, in reliance on this characterization, issued to the Glicks a Notice of Deficiency for the year 1976, the statute of limitations had passed for 1975. *See* Motion to Vacate Entry of Decision, Petitioners' App. C5, at ¶ 5. The Glicks now seek to recharacterize their 1976 capital gain as lacking substance so that it

should be backed out along with the losses which the Commissioner and the Tax Court in *Glass* found nondeductible. However, the Glicks are estopped from now disavowing their earlier position that they had experienced actual capital gains by the duty of consistency doctrine. *See Herrington,* 854 F.2d at 758.

*III. Conclusion.*

Because the Taxpayers have not shown that their trading patterns differed in any significant way from those relied on by the Tax Court in *Glass* and by this court in *Yosha* and their transactions resulted in allegedly "ordinary losses" in year one and offsetting "capital gains," if any, in the next and because their accounts were substantially zeroed out in each instance, we find that their due process rights were not denied when they were not granted a separate opportunity to develop the specific facts of their cases with regard to their intent to profit. In addition, they have failed to show that the Commissioner erred in computing the tax of the Glicks or of any other petitioner. Therefore, the decision of the Tax Court is affirmed in all respects.