T.C. Memo. 2004-117

UNITED STATES TAX COURT

CONRAD JANIS AND MARIA G. JANIS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

CARROLL JANIS AND DONNA L. SELDIN JANIS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14318-01, 1344-02.    Filed May 12, 2004.

Andrew J. Wilson, Brian D. Caplan, and Vicki G. Cheikes, for petitioners in docket No. 14318-01.

Michael Schlesinger, for petitioners in docket No. 1344-02.

Lydia A. Branche and Shawna A. Early, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined deficiencies in petitioners Conrad Janis and Maria G. Janis's (Conrad and Maria)

Federal income taxes for 1995, 1996, and 1997 and penalties under section 6662(a) for those years, respectively, as follows:

| Year | Deficiency | Sec. 6662(a) Penalty |
|------|-----------|----------------------|
| 1995 | $334,589 | $66,918 |
| 1996 | 24,739 | 4,948 |
| 1997 | 158,356 | 31,671 |

Respondent determined deficiencies in petitioners Carroll Janis and Donna L. Seldin Janis's (Carroll and Donna) Federal income taxes for 1995, 1996, and 1997 and penalties under section 6662(a) for those years, respectively, as follows:

| Year | Deficiency | Sec. 6662(a) Penalty |
|------|-----------|----------------------|
| 1995 | $532,930 | $106,586 |
| 1996 | 58,635 | 11,727 |
| 1997 | 169,248 | 33,849 |

The issues for decision in these consolidated cases are: (1) Whether petitioners, who inherited an art gallery, can calculate the gallery's cost of goods sold using the undiscounted value of the gallery's collection of artwork rather than the discounted value as determined for estate tax purposes and (2) whether petitioners are liable for accuracy-related penalties under section 6662(a) for 1995, 1996, and 1997.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  At the time that Conrad and Maria filed their petition at docket No. 14318-01, they resided in California.  At the time that Carroll and Donna filed their petition at docket No. 1344-02, they resided in New York.

Background

Sidney Janis (Sidney), the father of petitioners Conrad Janis (Conrad) and Carroll Janis (Carroll), owned and operated as a sole proprietorship the Sidney Janis Gallery (gallery) in New York City from 1948 until 1988.  Pursuant to a trust agreement, Sidney transferred the gallery to an irrevocable trust in April 1988.  In the trust agreement, Sidney named himself, Conrad, and Carroll as the trustees of the trust.  Sidney retained an income interest in the trust for his life as well as a general power of appointment over the trust's assets.  At Sidney's death, the trust was to terminate, and any trust assets that Sidney had not exercised his general power of appointment over were to be distributed to Conrad and Carroll in equal shares.  Sidney died on November 23, 1989.  In his will, Sidney named Conrad and Carroll co-executors and sole beneficiaries of his estate.

Carroll obtained a bachelor of science degree as well as a master's degree in art history from Columbia University.  Before

attending college, Carroll worked in the gallery. Carroll returned to the gallery in 1964 and worked there until it closed. Conrad also worked in the gallery for a period of time.

Determining the Value of the Gallery and Its Collection for Purposes of Sidney's Estate Tax Return

Sidney's estate filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, on February 28, 1991. George J. Noumair prepared the Form 706. On the Form 706, the value of the gallery was reported to be $19,533,750. This amount included a discounted value of $12,403,207 for the 464 works of art (the collection) that the gallery owned on the date of Sidney's death, cash and cash equivalents of $8,171,302, and liabilities of $1,040,759.

In order to determine the value of the gallery for estate tax purposes, Sidney's estate employed Sotheby's to prepare an appraisal of the collection. Sotheby's explained the basis for its appraisal as follows:

> In accordance with your request, we have appraised the works of art owned by the Sidney Janis Gallery, with a view towards determining the fair market value thereof as of May 23, 1990, six months after the date of death of Sidney Janis. * * * We have valued these works on an item-by-item basis at fair market value. * * *

> * * * * * * *

> Despite the large number of works held by the Gallery, we have not taken into account any overall dimunition [sic] in value which might occur if the entire holdings were to be placed for sale in the ordinary course in the market at one time, which is the

underlying basis for the attached appraisal. We have valued these works of art on an individual basis as of the relevant valuation date.

Furthermore, we have not taken into account any dealer's discount. It is common practice in the trade for a gallery to sell a work to another dealer at a discount ranging as high as 40% off the value in the retail market and, more commonly, in the one third range, so that the dealer may make a profit on resale.

Lastly, we have not undertaken to determine the value of the Gallery as a whole. * * *

Based upon its review, Sotheby's determined that the undiscounted value of the collection was $25,876,630.

Sidney's estate determined the discounted value of the collection by first applying a discount totaling $4,059,540 to account for the large number of works in the collection by Jean Arp, Louis Michel Eilshemius, Auguste Herbin, Morris Hirshfield, Piet Mondrian, Grandma Moses, and Kurt Schwitters. This discount had been recommended by Sotheby's. Next, a $350,000 discount was applied to account for the gallery's partial interest in three works of art in the collection. A $2,862,279 discount was then applied to account for the portion of the collection that would likely be sold in the dealer market (as opposed to the retail market). Finally, a $6,201,604 discount was applied to account for (1) the inability to sell the gallery in the retail market for individual works of art, (2) the gallery buyer's not paying the full resale price of the underlying assets acquired in the

bulk sale, and (3) the gallery buyer's taking into account the cost of maintaining the business for a reasonable period.

The Form 706 was examined by the Internal Revenue Service (IRS). In order to determine whether the correct value had been reported for the gallery on the Form 706, the IRS Art Advisory Panel (Panel) examined the collection. The Panel reviewed 227 of the 464 works of art in the collection, which represented 95 percent of the collection's undiscounted value as determined by Sotheby's. The Panel accepted the values determined by Sotheby's for the remaining works of art in the collection. Based upon this review, the Panel determined that the undiscounted value of the collection was $36,636,630 rather than the $25,876,630 undiscounted value that had been determined by Sotheby's. The Panel determined the collection's undiscounted value by adding the undiscounted values that it had determined for each work of art in the collection.

The Panel determined that the discounted value of the collection was $22,955,077. In determining this value, the Panel considered the various discounts that had been applied by Sidney's estate. While the Panel did not entirely agree with the discounts claimed by Sidney's estate, the Panel did agree that the application of a blockage discount was appropriate. The Panel gave the following explanation as to the factors that it

considered in reaching its decision to apply a blockage discount

to the undiscounted value of the collection:

In general, a blockage discount is applied to property in an estate in an attempt to reflect the market's response to a large number of items. Traditionally, as the cases of David Smith, Louisa Calder and Georgia O'Keeffe attest, a blockage discount is applicable in response to a large number of works by one artist, usually in an artist's estate. The Estate of Sidney Janis is not an artist's estate, and does not involve a large number of works by one particular artist, but rather works by many different artists. However, since it is a valuation problem involving a gallery inventory, some of the general principles are applicable.

A number of factors have been considered in determining whether a blockage discount is appropriate and to what extent it should be applied to the subject properties. Consideration was given to the prominence of the artists; the types of works in the estate; the distribution of the items (for example, the number and types, and their quality and saleability); the number of similar items available in the marketplace; the market's response to such works around the valuation date; the number of sales and the prices at which sales were made during the period immediately preceding and following death; the annual sales of the gallery; length of time necessary to dispose of the items; the works that are saleable within a relatively short period of time; the works that can only be marketed over a long period; the demonstrated earning capacity of the business; the tangible and intangible assets, including goodwill; and, the reputation of the gallery and the provenance.

In addition, consideration was given to the possible disbursement and handling of the gallery. One option would be the continuation of the gallery through Sidney Janis' surviving sons and the selling of the items in the course of business. Another option would be the sale of the gallery to a willing purchaser.

Attention was given to the gallery's annual gross and net receipts of the inventory since 1985.

Based upon the Panel's consideration of these factors, it determined that an overall weighted discount of 37 percent was appropriate. The value of the collection was subsequently further discounted to $14,500,000 (i.e., a total discount of approximately 60.42 percent). Accordingly, the IRS determined that the value of the gallery was $21,630,543.

On or about January 27, 1994, Conrad and Carroll, as co-executors of Sidney's estate, agreed to the adjustments made by the IRS with respect to the gallery and to the additional amount of tax owed by Sidney's estate by signing a Form 890, Waiver of Restrictions on Assessment and Collection of Deficiency and Acceptance of Overassessment--Estate, Gift, and Generation-Skipping Transfer Tax. The examination of the Form 706 was concluded on or about February 2, 1994, when the IRS sent to Conrad and Carroll an Estate Tax Closing Letter. Under section 6501, the period of limitations for assessment against the Form 706 filed by Sidney's estate expired on February 28, 1994, 3 years after the Form 706 was filed.

Reporting the Gallery's Operations From 1990 Through 1997

Conrad and Carroll operated the gallery through the trust until November 8, 1995. As of November 8, 1995, the trust was terminated and its assets (including the gallery) were distributed to Conrad and Carroll in equal shares. Subsequently, Conrad and Carroll contributed their interests in the gallery to

a partnership. The partnership continued to operate the gallery throughout the years in issue. Fiduciary income tax returns were filed for the trust for 1989 through 1995. Forms 1065, U.S. Partnership Return of Income, were filed for the partnership for 1996 and 1997.

David J. Silverman (Silverman) prepared the fiduciary income tax returns for the trust and the Forms 1065 for the partnership during those years. Silverman is an accountant and has been an enrolled agent since approximately 1974. Silverman assisted in the preparation of the Form 706 for Sidney's estate and had been a longtime tax adviser to the gallery and to Carroll and Donna prior to preparing the tax returns for the trust and the partnership. Silverman has also written extensively on the subject of taxes and has represented other art galleries in their tax matters.

On or about August 6, 1991, Silverman prepared the fiduciary income tax return filed for the trust for 1990. Attached to this fiduciary income tax return was a Schedule C, Profit or Loss from Business. The Schedule C reflected the trust's operation of the gallery during 1990. In order to determine the cost of goods sold (COGS) for 1990, the gallery used the discounted value of the collection as originally reported on Sidney's estate tax return, $12,403,207, as the value of the gallery's inventory at the beginning of that year. The value reported for the gallery's

inventory at the end of 1990 was $12,354,316.  Thus, the gallery reported that its COGS for 1990 was $48,891.  After subtracting returns and allowances, COGS, and its expenses from its amount of gross receipts and sales, the gallery reported a net loss of $516,223 for 1990.  This loss was carried through to the trust's fiduciary income tax return for 1990 and caused the trust to report a net operating loss for that year.

Silverman prepared the trust's fiduciary income tax returns for 1991 and 1992 in similar fashion.  On the Schedule C attached to the trust's fiduciary income tax return for 1991, the gallery reported that its COGS was $1,235,185 and that its operations generated a net loss of $432,229.  This loss was carried through to the trust's fiduciary income tax return for 1991 and, along with the trust's net operating loss for 1989 and a portion of the trust's net operating loss for 1990, offset the income that the trust earned that year.

On the Schedule C attached to the trust's fiduciary income tax return for 1992, the gallery reported that its COGS was $35,000 and that its operations generated a net loss of $652,797.  This loss was carried through to the trust's fiduciary income tax return for 1992 and caused the trust to report a net operating loss for that year.

On or about February 19, 1994, Silverman prepared amended fiduciary income tax returns for the trust for 1990, 1991, and

1992 in accordance with discussions that he had with Carroll and with Conrad's attorney about the applicability of the reasoning set forth in Augustus v. Commissioner, 40 B.T.A. 1201 (1939), affd. 118 F.2d 38 (6th Cir. 1941), to petitioners' situation. The Schedule C that was attached to the 1990 return was amended "per Art Advisory Panel" to reflect a beginning value for the gallery's inventory of $36,636,630; i.e., the collection's undiscounted value. A Form 8275, Disclosure Statement, was attached to the trust's amended return for 1990 and gave the following explanation for the change in the reported beginning value for the gallery's inventory:

> As the result of the IRS' audit of the estate's 706 the following adjustments were made:
>
>> 1. The trust's inventory was valued at $36,636,630
>
> *   *   *   *   *   *   *
>
> The adjustments to the inventory * * * required adjustments to previously filed returns that effected [sic] the cost of goods sold & the operating expenses for 1990 and in turn required the recomputation of the 1990, 1991 & 1992 NOL's

The same explanation was given on the Forms 8275 that were attached to the amended returns for 1991 and 1992.

By using the Panel's undiscounted value for the collection as its inventory value at the beginning of 1990, the gallery increased the reported amount of its COGS for 1990, 1991, and 1992 as follows:

| Year | Original COGS | Amended COGS |
|------|---------------|--------------|
| 1990 | $48,891 | $102,000 |
| 1991 | 1,235,185 | 1,660,000 |
| 1992 | 35,000 | 45,000 |

This increase in its COGS caused the gallery to generate a larger net loss for each of those years. Consequently, the trust's net operating loss for 1990 increased, the amount of the net operating loss from 1990 that was applied against the trust's income earned in 1991 decreased, and the trust's net operating loss for 1992 increased.

The trust's fiduciary income tax returns for 1993, 1994, and 1995 also reflected the gallery's use of the collection's undiscounted value as the value for its inventory. On those returns, the gallery reported the following amounts from its operations:

| Year | COGS | Net Loss |
|------|------|----------|
| 1993 | $235,000 | $727,416 |
| 1994 | 727,500 | 117,363 |
| 1/1/95-11/8/95 | 3,365,040 | 804,141 |

The trust's fiduciary income tax return filed for 1995 reported the trust's operations for the period between January 1, 1995, and November 8, 1995 (i.e., the day on which the trust was terminated), and was the trust's final return. The trust's fiduciary income tax return for 1995 reported that the value of the gallery's inventory was $31,518,850 as of November 8, 1995.

As a result of the gallery's operations generating net losses in 1993, 1994, and 1995, the trust reported net operating losses for 1993, 1994, and 1995. Disclosure statements, which gave the same or similar explanations as those on the Forms 8275 that were attached to the trust's amended fiduciary income tax returns for 1990, 1991, and 1992, were attached to each of the trust's returns for 1993, 1994, and 1995.

Two Schedules K-1 (Form 1041), Beneficiary's Share of Income, Deductions, Credits, etc., were attached to the trust's fiduciary income tax return for 1995. These Schedules K-1 reported that the net operating losses that had been generated by the trust's operations, which were reported to total $3,500,960, were distributed to Conrad and Carroll in equal share (i.e., $1,750,480 each).

For the period between the trust's termination and December 31, 1995, Conrad and Carroll separately reported their one-half interests in the gallery's operations on Schedules C that were attached to their Forms 1040, U.S. Individual Income Tax Return, for 1995. On these Schedules C, Conrad and Carroll reported that their one-half interests in the gallery's inventory had a beginning value of $15,759,425 (i.e., a value equal to one-half of the ending inventory value reported on the trust's final return). They reported that their one-half interests in the gallery's inventory had an ending value of $15,561,925.

Accordingly, Conrad and Carroll each reported that their COGS was $197,500 (i.e., $395,000 total) for this period. Conrad and Carroll also reported net profits of $130,366 and $134,176, respectively, from their interests in the gallery's operations during this period.

As reflected on the partnership's Forms 1065 for 1996 and 1997, the partnership valued the gallery's inventory in accordance with the collection's undiscounted value. Accordingly, the partnership reported that the value of the gallery's inventory at the beginning of 1996 was $31,123,850 (i.e., an amount equal to the sum of the reported values of the inventory comprising Conrad's and Carroll's one-half interests in the gallery as of the end of 1995). The following explanation was given on the Forms 8275 that were attached to the partnership's Forms 1065 for 1996 and 1997:

> Value of paintings of the Sidney Janis Art Gallery where [sic] valued at $36,636,630 by the IRS at the decedent's (Sidney Janis') death. After a blockage discount allowed by the IRS on audit the estate paid inheritance tax on $14,500,000 (the after blockage value of the paintings). In accordance with the decision in Elizabeth G. Augustus, 40 BTA 1201, * * * (ACQ), the heirs in operating the art gallery used the individual value of the paintings prior to the blockage discount as the basis of the paintings sold in determining gain or loss on these sales.

The partnership reported the following amounts from its operation of the gallery during 1996 and 1997:

| Year | COGS | Ordinary Loss |
|------|------|---------------|
| 1996 | $985,000 | $512,916 |
| 1997 | 1,277,000 | 546,466 |

The Schedules K-1 (Form 1065), Partner's Share of Income, Credits, Deductions, etc., attached to the partnership's Forms 1065 for 1996 and 1997 indicate that the partnership's ordinary losses were distributed equally between Conrad and Carroll.

Petitioners' Income Tax Returns for 1995, 1996, and 1997

Dean A. Avedon, C.P.A., prepared Conrad and Maria's joint income tax returns for 1995, 1996, and 1997. Silverman prepared the Schedules K-1 (Form 1065) that were attached to those returns. On each of those joint income tax returns, Conrad and Maria reported that they had no taxable income and owed no income tax. On their joint income tax return for 1995, Conrad and Maria reported the net operating loss carryover of $1,750,480 that had been distributed to them from the trust. The following explanation was given on this Form 8275 for the existence of the claimed net operating loss carryover:

> Value of paintings of an art gallery (Sidney Janis Gallery) transferred to a trust were valued at $36636630 by the IRS at the decedent's (Sidney Janis) death. After a blockage discount allowed by the IRS on audit the estate paid inheritance tax on an amount of $14500000 after the blockage discout [sic] reported on Form 706. In accordance with the decision in Elizabeth G. Augustus, 40 BTA 1201, 12/10/31 (ACQ) the trust used the individual value of the paintings prior to the blockage discount for the paintings sold by trust and for the one (1) painting sold by the heirs as reported on Schedule C.

On their joint income tax returns for 1996 and 1997, Conrad and Maria reported net operating loss carryovers of $714,627 and $847,645, respectively. Neither of these returns contained a Form 8275 or similar disclosure statement.

Silverman prepared Carroll and Donna's joint income tax returns for 1995, 1996, and 1997. On their joint income tax return for 1995, Carroll and Donna reported the net operating loss carryover of $1,750,480 that had been distributed to them from the trust. In addition, they reported that they had no taxable income for that year. On their joint income tax returns for 1996 and 1997, Carroll and Donna reported net operating loss carryovers of $123,985 and $202,381, respectively. They also reported that they had no taxable income and owed no income tax for 1996 and $15,312 of taxable income and owed $1,531 for 1997. Neither a Form 8275 nor a similar disclosure statement was attached to Carroll and Donna's joint income tax returns for 1995, 1996, or 1997.

Examination of Petitioners' Income Tax Returns for 1995, 1996, and 1997

Petitioners' 1995, 1996, and 1997 income tax returns were examined by the IRS. As a part of this examination, the trust's fiduciary income tax returns for the years 1990 through 1995 and the partnership's Forms 1065 for 1996 and 1997 were also examined. Respondent determined that, for purposes of calculating the gallery's COGS for the years 1990 through 1997,

the gallery's basis in the collection should have been reported in accordance with the discounted value that had been determined by the Panel and agreed to by Conrad and Carroll for estate tax purposes (i.e., $14,500,000) rather than the undiscounted value (i.e., $36,636,630). Consequently, adjustments were made to the gallery's reported COGS as follows:

| Year | COGS Per Return | COGS As Adjusted |
|---|---|---|
| 1990 | $102,000 | $40,369 |
| 1991 | 1,660,000 | 1,055,779 |
| 1992 | 45,000 | 17,180 |
| 1993 | 235,000 | 98,008 |
| 1994 | 727,500 | 287,929 |
| 1/1/95–11/8/95 | 3,365,040 | 1,331,811 |
| 11/9/95–12/31/95 | 395,000 | 156,333 |
| 1996 | 985,000 | 389,842 |
| 1997 | 1,277,000 | 505,410 |

These adjustments to the gallery's COGS caused a corresponding adjustment to the gallery's reported profits or losses for those years. Accordingly, respondent determined that the trust should have reported that net operating losses totaling only $193,144 were distributed to Conrad and Carroll on its 1995 fiduciary income tax return. Respondent also determined that the partnership should have reported income rather than losses from its operation of the gallery during 1996 and 1997.

Based upon these adjustments, respondent determined that adjustments to petitioners' joint income tax returns for 1995, 1996, and 1997 were appropriate. With respect to their joint income tax returns for 1995, respondent determined that

petitioners should have reported that a net operating loss carryover of only $96,572 had been distributed to each of them from the trust. Moreover, respondent determined that Conrad and Carroll should have reported larger profits on the Schedules C that reflected their operation of the gallery for the period between the trust's termination and December 31, 1995. With respect to their joint income tax returns for 1996 and 1997, respondent disallowed petitioners' claimed net operating loss carryovers.

OPINION

## Petitioners' Basis in the Collection for Purposes of Determining the Gallery's Cost of Goods Sold

Section 1014 provides the rules for determining the basis of property acquired from a decedent. The general purpose of section 1014 is to provide a basis for property acquired from a decedent that is equal to the value placed upon such property for purposes of the Federal estate tax. Sec. 1.1014-1(a), Income Tax Regs. Accordingly, section 1014 provides that the basis of property acquired from a decedent is the fair market value of the property at the date of the decedent's death or on the alternate valuation date. Sec. 1014(a); sec. 1.1014-1(a), Income Tax Regs. The fair market value of the property as of the date of the decedent's death or as of the alternate valuation date is deemed to be the value of the property as appraised for purposes of the Federal estate tax. Sec. 1.1014-3(a), Income Tax Regs.

Petitioners contend that they are not liable for the deficiencies asserted against them for 1995, 1996, and 1997 because their basis in each work of art in the collection, as provided under section 1014, is the undiscounted fair market value that the Panel determined for that work. Essentially, petitioners contend that if the Panel determined that the undiscounted value of an individual work of art was $100,000, that value is their basis in that work under section 1014. Consequently, petitioners contend that the gallery should have been allowed to use that undiscounted value in calculating its gain or loss on the subsequent sale of that work of art, not $39,580 (i.e., $100,000 discounted by 60.42 percent).

Respondent contends that the basis of the individual works of art in the collection is the proportionate amount of the discounted value that was agreed to for estate tax purposes, which should be used to calculate the gallery's COGS. Respondent further contends that petitioners are estopped under the duty of consistency from claiming that the collection's discounted value, as determined for estate tax purposes, is only a presumptive value that may be rebutted for income tax purposes. We address each of these contentions in turn.

1.   Whether The Basis of Each Work of Art in the Collection
     Is the Work's Undiscounted Fair Market Value as
     Determined by the Panel

Petitioners argue that (1) Augustus v. Commissioner, 40
B.T.A. 1201 (1939), has facts that are identical to this case
and, therefore, is controlling and (2) the "appraised value"
contemplated by section 1.1014-3(a), Income Tax Regs., is the
undiscounted fair market value that was determined by the Panel
for each work of art in the collection.  For the reasons set
forth below, petitioners' arguments are unpersuasive.

In Augustus v. Commissioner, supra at 1202, 1203, the Board
of Tax Appeals was presented with a question regarding the basis
of 2,525 shares of F.W. Woolworth Co. stock that the taxpayer
sold in 1935 for $149,203.99.  These shares had been acquired by
the taxpayer from the intestate estate of her mother and were
appraised as of the date of her mother's death, November 9, 1928,
for Federal estate tax purposes.  Id. at 1203-1204.  After
applying a blockage discount, respondent determined that the
shares of stock had a value equal to $207,050 (i.e., $82 per
share), and the Federal estate tax liability of the estate of the
taxpayer's mother was determined on that basis.  Id. at 1204.
The average selling price of shares of F.W. Woolworth Co. stock
on November 9, 1928, as determined from sales made on the New
York Stock Exchange, was $86.70 per share.  Id. at 1208.

The taxpayer argued that the determination of value for purposes of the estate tax did not conclusively establish fair market value and that her gain or loss upon the sale of the stock should have been computed upon the basis of the stock's actual fair market value on the date of her mother's death, if it was established that that value was different from the value at which the stock was included for estate tax purposes. Respondent contended that the value at which the stock was appraised for Federal estate tax purposes, and upon which value that tax was paid, established the fair market value of the stock received by the taxpayer from her mother's estate. The Board of Tax Appeals agreed with the taxpayer and provided the following reasoning for its decision:

> Whether the petitioner has established that value is a question of fact. <u>No evidence supporting the application of the blockage rule appears in the record.</u> However, the facts stipulated disclose that the volume of trading in this particular stock at or about the date of death of petitioner's mother was not only very large, compared with the block of stock to be valued, but that the price trend was upward. In our judgment, this record thus overcomes the presumption of correctness attaching to respondent's determination of basis. We find that on November 9, 1928, the fair market value of the 2,525 shares of stock sold by petitioner in 1935 was $86.70 per share. [<u>Id.</u>; citation omitted and emphasis added.]

Contrary to petitioners' understanding of <u>Augustus</u>, the Board of Tax Appeals concluded that the taxpayer could use the undiscounted fair market value of the F.W. Woolworth Co. stock as of November 9, 1928, as her basis for income tax purposes because

there was no evidence in the record that established that a blockage discount should have ever been applied to the value of that stock for estate tax purposes. Thus, the correct fair market value was the actual trading price on the date of death. In the case at hand, however, there is evidence from petitioners and respondent that sets forth the reasoning for applying a blockage discount to the collection's value for estate tax purposes. Moreover, unlike the taxpayer in Augustus, petitioners do not contend that the application of a blockage discount was inappropriate in determining the value of the collection for estate tax purposes. Because there is no indication as to how the Board of Tax Appeals might have held if the application of the blockage discount had been proper or undisputed in Augustus, we conclude that the application of its reasoning to this case is unwarranted and that petitioners' reliance on the case is misplaced.

Section 1.1014-3(a), Income Tax Regs., provides that the fair market value of the property acquired from a decedent as of the date of the decedent's death or as of the alternate valuation date is deemed to be the value of the property as appraised for purposes of the Federal estate tax. This regulation has been construed to mean that the value arrived at by such an evaluation is only prima facie correct and may be shown to be erroneous. Plaut v. Munford, 188 F.2d 543, 545 (2d Cir. 1951); Delone v.

Commissioner, 6 T.C. 1188, 1192 (1946); Kirsch v. Commissioner, T.C. Memo. 1985-114, affd. without published opinion 786 F.2d 1170 (8th Cir. 1986); Hawkinson v. Commissioner, T.C. Memo. 1972-32; McIntosh v. Commissioner, T.C. Memo. 1967-230. Petitioners, however, do not contend that the discounted value of the collection is erroneous. Instead, petitioners contend that the discount determined by the Panel was attributable to the collection as a whole and does not apply in determining the value of each work of art that sold separately. Thus, petitioners argue that the "appraised value" contemplated by section 1.1014-3(a), Income Tax Regs., is the undiscounted fair market value determined by the Panel for each work of art in the collection.

A blockage discount was applied in determining the value of the collection because of the collection's size and nature. In determining the blockage discount, the Panel took into account, inter alia, the possibility that the market might be flooded if the individual works of art were put up for sale at the same time or, alternatively, the possibility that the collection would be disposed of over time in order to realize each work's full value. See, e.g., Calder v. Commissioner, 85 T.C. 713, 721-726 (1985); Estate of Smith v. Commissioner, 57 T.C. 650, 658-659 (1972), affd. 510 F.2d 479 (2d Cir. 1975). Because the substantive effect of the blockage discount was to establish a proportionate value for each work of art in the collection that reflected these

possibilities, it follows that the "appraised value" contemplated by section 1.1014-3(a), Income Tax Regs., for each work of art in the collection is a value that includes the blockage discount determined by the Panel.  Accordingly, under section 1014 and section 1.1014-3(a), Income Tax Regs., petitioners' basis in each work of art in the collection is equal to the work's proportionately discounted value as determined for estate tax purposes.

2.  Whether Respondent Has Established That Petitioners Are Estopped by the Duty of Consistency

The "duty of consistency", sometimes referred to as quasi-estoppel, applies in this Court.  E.g., Estate of Letts v. Commissioner, 109 T.C. 290, 296-301 (1997); Cluck v. Commissioner, 105 T.C. 324, 331-336 (1995); LeFever v. Commissioner, 103 T.C. 525, 541-545 (1994), affd. 100 F.3d 778 (10th Cir. 1996); Unvert v. Commissioner, 72 T.C. 807, 814-818 (1979), affd. 656 F.2d 483 (9th Cir. 1981); Mayfair Minerals, Inc. v. Commissioner, 56 T.C. 82, 89-94 (1971), affd. 456 F.2d 622 (5th Cir. 1972).  The duty of consistency is based on the theory that a taxpayer has a duty to be consistent in the tax treatment of items and will not be permitted to benefit from the taxpayer's own prior error or omission.  LeFever v. Commissioner, supra at 541.  The duty of consistency doctrine prevents a taxpayer from taking one position one year and a contrary position in a later year after the limitations period has run for

the first year.  Id. at 541-542.  A taxpayer gaining governmental benefits on the basis of a representation or an asserted position is thereafter estopped from taking a contrary position in an effort to avoid taxes.  Id. at 542.  Respondent has the burden of proof on this issue because the duty of consistency is an affirmative defense.  Rule 142(a)(1); see Cluck v. Commissioner, supra at 331 n.11.

The taxpayer's duty of consistency applies if:  (1) The taxpayer made a representation of fact or reported an item for tax purposes in one tax year; (2) the Commissioner acquiesced in or relied on that fact for that year; and (3) the taxpayer desires to change the representation previously made in a later tax year after the earlier year has been closed by the statute of limitations.  LeFever v. Commissioner, supra at 543; see also Kielmar v. Commissioner, 884 F.2d 959, 965 (7th Cir. 1989); Herrington v. Commissioner, 854 F.2d 755, 758 (5th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Shook v. United States, 713 F.2d 662, 667 (11th Cir. 1983); Hess v. United States, 210 Ct. Cl. 483, 537 F.2d 457, 463 (1976); Beltzer v. United States, 495 F.2d 211, 212 (8th Cir. 1974); Estate of Letts v. Commissioner, supra at 297; Cluck v. Commissioner, supra at 332.  When these requirements are met, respondent may act as if the previous representation is true, even if it is not, and the

taxpayer may not successfully assert the contrary. Herrington v. Commissioner, supra at 758.

The three elements of the duty of consistency refer to conflicting representations that are made by a taxpayer. The duty of consistency, however, can also bind a beneficiary of an estate to a representation made on an estate tax return if the beneficiary was a fiduciary of the estate. Beltzer v. United States, supra; see also Hess v. United States, supra; Estate of Letts v. Commissioner, supra at 298; Cluck v. Commissioner, supra at 333; LeFever v. Commissioner, supra at 543-544; Griffith v. United States, 27 AFTR 2d 71-754, 71-1 USTC par. 9280 (N.D. Tex. 1971); McMillan v. United States, 14 AFTR 2d 5704, at 5706-5707, 64-2 USTC par. 9720, at 93,839 (S.D. W. Va. 1964). Whether there is sufficient identity of interests between the parties to apply the duty of consistency in such a situation depends on the facts and circumstances of each case. Cluck v. Commissioner, supra at 335. In this case, there is a sufficiently close relationship between petitioners and Sidney's estate because Conrad and Carroll were co-executors and beneficiaries of Sidney's estate as well as cotrustees and beneficiaries of the trust to which the gallery had been transferred prior to Sidney's death. See, e.g., Hess v. United States, supra at 464; Estate of Letts v. Commissioner, supra at 298-299; LeFever v. Commissioner, supra at 543-544; Griffith v. United States, supra; McMillan v. United

States, supra.  Accordingly, petitioners and Sidney's estate are sufficiently related to be treated as one taxpayer for purposes of the duty of consistency.

Respondent has established that all three elements of the duty of consistency are present in this case.  Conrad and Carroll agreed that the discounted value of the collection was $14,500,000, and the Commissioner relied upon that value in assessing the estate tax owed by Sidney's estate.  Once the period for assessment against Sidney's estate had closed, however, petitioners claimed that the collection's undiscounted value should be used to calculate the gallery's COGS.  Because all three elements of the duty of consistency are satisfied, we hold that petitioners are bound to use the collection's discounted value as their basis for purposes of calculating the gallery's COGS for 1990 through 1997.

## Section 6662 Accuracy-Related Penalties

In petitioners' statutory notices of deficiency, respondent asserted accuracy-related penalties under section 6662(a) for (1) negligence or disregard of rules or regulations, (2) substantial understatement of income tax, or (3) substantial valuation overstatement.  On brief, however, respondent abandons the negligence ground and asserts only that petitioners are liable for the accuracy-related penalties under section 6662(a) for a substantial understatement of tax under section 6662(b)(2).

A taxpayer may be liable for a penalty under section 6662(a) on the portion of an underpayment due to a substantial understatement of income tax. Sec. 6662(b)(2). An understatement of income tax is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, less any rebate. Sec. 6662(d)(2)(A). Respondent has the burden of production under section 7491(c) and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). In this case, the understatement on each of petitioners' returns satisfies the definition of "substantial", so respondent has met that burden of production. Once respondent meets the burden of production, the taxpayer must come forward with persuasive evidence that respondent's determination is incorrect. Id.

The section 6662(a) penalty will not be imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, supra at 448-449. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made by taking into account all of the pertinent facts and circumstances.

Sec. 1.6664-4(b)(1), Income Tax Regs. Relevant factors include the taxpayer's efforts to assess his proper tax liability, including the taxpayer's reasonable and good faith reliance on the advice of a tax professional. See id.; see also sec. 1.6664-4(c), Income Tax Regs.

The evidence in this case shows that Carroll and Donna reasonably and in good faith relied on Silverman's advice as to using the collection's undiscounted value to calculate the gallery's COGS. Silverman had had a long relationship with Carroll and Donna and with the gallery. Carroll, although well educated, testified that he did not have any special training or knowledge with respect to the subject of Federal income taxes. Moreover, Carroll trusted Silverman with the gallery's books and records and his personal financial matters. Accordingly, we believe that Carroll respected Silverman's judgment when it came to tax matters and that this trust extended to Silverman's explanation of the applicability of the reasoning of Augustus v. Commissioner, 40 B.T.A. 1201 (1939), to petitioners' situation. Therefore, the imposition of a section 6662(a) penalty is not warranted with respect to Carroll and Donna.

Neither Conrad nor Maria was present at trial, and the record does not establish whether either of them spoke with Silverman directly about Augustus. There is evidence, however, that Silverman met with Conrad's attorney and discussed the

applicability of the reasoning of that case to petitioners'
situation.  Carroll testified that he and Conrad had reached a
mutual decision to rely on Silverman with respect to the
gallery's tax matters.  Conrad and Maria's reliance on <u>Augustus</u>
is reflected on the Form 8275 that was attached to the joint
income tax return that they filed for 1995.  While Conrad and
Maria did not rely on Silverman to prepare their personal income
tax returns, they relied on the position that he advanced for
calculating the gallery's COGS.  Accordingly, because their
reliance on Silverman's advice caused the underpayments on their
joint income tax returns for the years in issue, respondent's
imposition of section 6662(a) penalties against Conrad and Maria
will not be sustained.

<u>Conclusion</u>

We hold that petitioners are liable for deficiencies in
their income taxes for 1995, 1996, and 1997.  We also hold that
the accuracy-related penalties under section 6662(a) are
unwarranted because of petitioners' reasonable and good faith
reliance on Silverman's advice.  We have considered the arguments
of the parties that were not specifically addressed in this
opinion.  Those arguments are either without merit or irrelevant
to our decision.

To reflect the foregoing,

Decisions will be entered for respondent with respect to the deficiencies and for petitioners with respect to the penalties.