T.C. Memo. 2021-67

UNITED STATES TAX COURT

NEW CAPITAL FIRE, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25505-06.                    Filed June 2, 2021.

Upon a merger with T on Dec. 4, 2002, P acquired appreciated assets, sold the assets, reported a carryover basis in the assets and capital gains on the asset sale, and engaged in option transactions to generate loss deductions to offset the reported gains. T did not file its own tax return for its 2002 taxable year. Instead, P attached a pro forma return for T to P's return for the year of the merger. R prepared a substitute for return for T for a short taxable year ending on the merger date. R issued a notice of deficiency to T determining that the merger was a taxable event and T had capital gains on the transfer of its assets to P. We held in <u>New Capital Fire, Inc. v. Commissioner</u>, T.C. Memo. 2017-177, that P's return began the running of the period of limitations as to T's 2002 taxable year, the notice of deficiency issued to T was untimely, and the statute of limitations barred assessment of the determined deficiency for that year.

After our decision there had become final, P filed an amended petition in this case alleging that it did not realize capital gains on the sale of T's assets on the basis that the merger was a taxable event, i.e., the position that R had taken against T in T.C. Memo. 2017-177.

**Served 06/02/21**

[*2]    Accordingly, P asserted that it did not realize the capital gains it had reported on its return.  P and T are in privity for tax reporting purposes.

R argues, in part, that P should be estopped from changing its reporting of the asset sale after T's tax year has closed to the detriment of R, under the doctrine of equitable estoppel.  P argues that the doctrine of equitable estoppel does not apply.

Held:  P is estopped under the doctrine of equitable estoppel from changing its reporting of its bases in T's assets that P acquired in the merger because the statute of limitations bars assessment of tax against T.

Held, further, P realized capital gains on the sale of T's assets in the amount that P reported on its return.

Jasper G. Taylor III and Richard L. Hunn, for petitioner.

Courtney L. Frola, Jeffrey B. Fienberg, Ruba Nasrallah, and M. Jeanne Peterson, for respondent.

MEMORANDUM OPINION

GOEKE, Judge:  Respondent issued to petitioner a notice of deficiency for its short taxable year November 6 through December 31, 2002 (2002 tax year), in which he disallowed the deductions of $9,662,707 in short-term capital losses from the sale of digital S&P 500 Index options (SPX options), interest, and

[*3] consulting fees and determined a 40% accuracy-related penalty for a gross valuation misstatement on the portion of the underpayment attributable to the SPX option capital losses and a 20% accuracy-related penalty on the remaining portion of the underpayment. Respondent disallowed the SPX option capital loss deduction on the basis that the SPX option transactions were tax shelters. He determined that petitioner entered into the transactions for tax avoidance purposes and the transactions had no business purpose other than tax avoidance, lacked economic substance, and were economic shams. Petitioner concedes the disallowance of the SPX option loss, interest, and consulting fee deductions that respondent disallowed in the notice of deficiency. The parties have settled the penalties.

Petitioner engaged in the SPX options to generate losses to offset capital gains of approximately $7.6 million from the sale of marketable securities. Petitioner reported the capital gains but now argues that it should not have. Without such capital gains, there would have been no need for any artificially generated losses as an offset. Petitioner acquired the securities in a merger and argues that the target corporation that merged out of existence should have reported the capital gains. The target corporation did not report the capital gains, and the statute of limitations bars assessment against it.

**[\*4]** The sole issue is whether the capital gains are includible in determining petitioner's taxable income for its 2002 tax year. We hold they are. The resolution depends on whether petitioner is equitably estopped from changing its tax reporting of the capital gains. We hold it is.

## Background

The parties have submitted this case for decision without trial under Rule 122.[1] After filing simultaneous opening briefs, the parties filed a joint motion to supplement the record, which we granted on March 9, 2020. After filing answering briefs, the parties also filed a joint motion for leave to file simultaneous reply briefs, which we granted on July 7, 2020. When the petition was filed, petitioner had its principal place of business in New York.

## I. Merger Transaction

Petitioner was organized as a Delaware corporation on November 6, 2002, as a wholly owned subsidiary of the Capital Fire Insurance Co., which we refer to as Old Capital. Old Capital was the sole owner of petitioner from November 6, 2002, until December 4, 2002. On December 4, 2002, petitioner and Old Capital

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), title 26, U.S.C., in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*5] merged with petitioner surviving. The merger of Old Capital and petitioner was the first step in a two-step merger.

To accomplish the two-step merger, two other corporations were organized, CF Merger Corp. (CF Merger), on October 4, 2002, and CF Acquisition Corp. (CF Acquisition), on October 28, 2002, which became the sole owner of CF Merger. The second step of the merger was a merger of petitioner into CF Merger with petitioner surviving. Both steps of the mergers occurred on the same date, one hour apart. After the two-step merger, petitioner was wholly owned by CF Acquisition.

At the time of the merger, Old Capital held a portfolio of marketable securities worth approximately $16.3 million that had appreciated by approximately $7.9 million over their cost basis, i.e., built-in capital gains (Old Capital's securities). As explained further below, Old Capital's shareholders wanted to divest themselves of ownership in a manner that would minimize the overall tax on the built-in gains at the corporate and shareholder levels. The two-step merger was structured with the help of Diversified Group, Inc. (DGI), and James Haber, its founder and president. DGI represents itself as being in the business of designing tax-oriented structures and solving tax problems. Mr. Harber was the president, secretary, and treasurer of CF Acquisition.

[*6] Under the first step of the merger, Old Capital's securities were transferred to petitioner. One day before the merger, December 3, 2002, Mr. Haber executed a binding agreement for CF Acquisition to sell substantially all of Old Capital's securities to PaineWebber, and Old Capital transferred the securities to a newly opened account in its own name at PaineWebber to facilitate the subsequent sale by CF Acquisition. CF Acquisition sold the securities on December 5, 9, or 12, 2002, pursuant to the binding agreement. On December 5, 2002, PaineWebber transferred $13.5 million in connection with its agreement to purchase Old Capital's securities. The $13.5 million payment was transferred to repay a loan that was used to buy Old Capital's stock. Thus, in substance, the built-in gains funded the payout to Old Capital's shareholders for their stock.

On December 9, 2002, petitioner purchased stock in Northmoy Ltd. (Northmoy), foreign private limited company (Northmoy stock purchase). On December 10, 16, and 30, 2002, Northmoy purchased the SPX options. It sold the SPX options on December 30, 2002, for a capital loss of $9,662,707, as follows:

[*7]

| Name | Acquired | Cost basis | Sale price | Gain/loss |
|------|----------|-----------|-----------|-----------|
| Call | Dec. 10 | $18,957,641 | $15,784,081 | ($3,173,560) |
| CMBO | Dec. 16 | 25,055,881 | -0- | (25,055,881) |
| Call | Dec. 30 | 433,266 | 19,000,000 | 18,566,734 |
| Total | | 44,446,788 | 34,784,081 | (9,662,707) |

II.    Return Reporting

Petitioner filed Form 1120, U.S. Corporation Income Tax Return, for its 2002 tax year, listing its business activity as investment.  It reported that it was wholly owned by CF Acquisition at the end of the tax year.  On the first page of the return, it reported that it had assets of over $13.8 million as of the end of the tax year.  Mr. Haber signed the return as petitioner's president.

Petitioner reported that it had merged with Old Capital with petitioner surviving, with the following statement attached to the return:

> On December 4, 2002, The Capital Fire Insurance Company, a New Hampshire insurance corporation, was merged into New Capital Fire, Inc. a Delaware (non-insurance) corporation.  At the time of the merger, The Capital Fire Insurance Company ceased its insurance operations.  * * *

> The operations of The Capital Fire Insurance Company are included in this return on Form 1120-PC Statement.

A copy of the certificate of merger and an incumbency certificate for CF Acquisition were attached to the return.  The certificate of merger stated that the

**[*8]** merger agreement was on file with the New Hampshire Insurance Department (NHID).  The incumbency certificate stated that there was a merger agreement among CF Acquisition, CF Merger, Old Capital, and petitioner.  The return did not report that the first step of the merger was a reorganization under section 368(a)(1)(F) (F reorganization) or any other Code section.  Nor did it use the terms nontaxable or tax free to describe the first merger.  It did not expressly identify the first merger as a taxable or nontaxable event.  The return did not disclose the second step of the merger.

Petitioner attached an unsigned Form 1120-PC, U.S. Property and Casualty Insurance Company Income Tax Return (pro forma return), to its return and marked it as Old Capital's final return.  The pro forma return did not report an end date for Old Capital's 2002 tax year.  It reported that Old Capital owed tax of $12,454.  Schedule L, Balance Sheets per Books, of the pro forma return reported that Old Capital had yearend assets of approximately $13 million.

On its return, petitioner reported Old Capital's $12,454 tax as the total tax it owed for its 2002 tax year.  Petitioner's return included Schedule D (Form 1120), Capital Gains and Losses, which reported that it sold the securities between December 5 and 12, 2002, for total proceeds of $13,369,020.  It reported long-term capital gains of $7,528,027 from the sale of Old Capital's securities and net

[*9] short-term capital losses of $9,399,285, including short-term capital losses of $9,662,707 attributable to the SPX options.  Accordingly, petitioner reported net capital gain of zero.  On an attachment to the Schedule D, petitioner reported its acquisition dates using Old Capital's acquisition dates, which ranged from 1981 to September 1, 2002, and reported Old Capital's basis in the securities as its own cost basis.  The reporting is consistent with treating the first step of the merger as a nontaxable event.  However, nowhere on the return did petitioner expressly indicate that it obtained the securities in the merger or was reporting Old Capital's acquisition dates or bases as its own.  On Schedule L petitioner reported yearend assets of over $13.8 million including shareholder loans of approximately $13.5 million.

Old Capital did not file its own income tax return for the short tax year ending on the merger date, December 4, 2002.  The nonfiling of a separate return is consistent with treating the first step as a nontaxable event under section 368(a)(1)(F).  See sec. 1.381(b)-1(a)(2), Income Tax Regs. (requiring the surviving corporation in an F reorganization to file a single full-year return reporting the operations of both the surviving and the terminating corporations for the periods before and after the reorganization).

[*10] CF Acquisition filed consolidated tax returns for the tax years 2003 through 2005 that reported that it was in the business of investments. These returns continued to report yearend assets of approximately $13.5 million.

III.   History of Old Capital

Old Capital was founded in 1886 as a closely held property and casualty insurance company. On the merger date, most of its 36 shareholders were descendants and heirs of the company's founder. Old Capital's corporate charter gave it power to engage in insurance activity and to own a limited amount of real estate. It was regulated by the NHID and was required to hold assets sufficient to pay its potential insurance claims. Since 1952 Old Capital's insurance business had been limited to reinsurance, and by the 1990s its insurance business was minimal. It had no employees and did not market itself as an insurance company.

Old Capital's primary activity was serving as a family investment company. Most of its assets consisted of publicly traded securities that it managed under a buy-and-hold strategy. Its $16.3 million in assets on the merger date far exceeded the amount of investments required under State law for purposes of the level of its insurance business. On the merger date, it held only two reinsurance contracts with a related company. From 1998 through 2001, the four years proceeding the merger, Old Capital reported net underwriting losses.

[*11] IV.    Decision To Sell

By 2000 a substantial number of Old Capital shareholders had expressed a desire to divest themselves of their ownership in the company.  In late 2000 Old Capital's board of directors began making inquiries about a sale or liquidation.  In December 2000 Rolf Gesen, a shareholder and a member of Old Capital's board of directors, prepared a report for the board that outlined four possible scenarios: continuing the business in its current form, liquidating Old Capital's assets and terminating its existence, selling Old Capital in a stock sale "as is", or liquidating Old Capital's assets and selling the company as a shell.  The report stated that liquidation would result in high tax on the capital gains from the sale of Old Capital's securities and an as-is stock sale would minimize tax.  Mr. Gesen indicated in the report that it was unlikely that a buyer would purchase Old Capital as an insurance company.

In 2001 the board of directors began to explore a potential sale of the company, making inquiries with an investment bank and a broker.  From these discussions, the board concluded that it was unlikely that Old Capital could be sold as is and that the most suitable outcome would be to liquidate Old Capital's securities and sell the insurance charter as a shell company.  The board engaged Steven Lauwers and William Ardinger of Rath, Young, and Pignatelli, P.A.

**[*12]** (RYP), for advice on a sale of the company or its assets and the tax consequences of a sale. Mr. Lauwers has legal experience in the insurance industry, and Mr. Ardingers is a tax attorney. The board made clear to the attorneys that they wanted to structure the divestiture in a manner that would minimize corporate and shareholder tax. In his solicitation for a prospective purchaser, Mr. Lauwers described Old Capital as owning an investment portfolio with significant unrecognized built-in capital gains and stated that the shareholders wanted to avoid two levels of tax on those built-in gains, i.e., at the shareholder and corporate levels, and preferred to sell the company with its investments in place.

In September 2001 Mr. Haber sent a letter to Old Capital's board expressing an interest in purchasing 100% of Old Capital's stock for a price computed on the basis of Old Capital's cash and 90% of the fair market value of its securities. Mr. Haber provided an overview of DGI that described DGI's business as designing tax-oriented structures and assisting corporations in solving tax problems. The board decided to pursue DGI's proposal. In December 2001 Mr. Lauwers sent a confidential offering memorandum for Old Capital to DGI. Mr. Lauwers represented that Old Capital anticipated that its insurance license would transfer to the purchaser.

**[*13]** On January 2, 2002, DGI made a nonbinding expression of interest to purchase Old Capital's stock for a price equal to 100% of Old Capital's cash and 92.5% of the fair market value of its securities (purchase offer). The purchase offer stated that DGI intended "to enter into a stand alone tax strategy intended to generate a taxable loss that would largely or entirely offset any taxable gain resulting from the sale of the Company's investment assets." The purchase offer was conditioned on Old Capital's terminating its insurance licence. DGI was the only prospective buyer to make a firm offer for Old Capital.

In February 2002 Mr. Lauwers, Mr. Haber, and John Huber, also from DGI, presented the purchase offer to the board as a stock sale that would allow Old Capital's shareholders to avoid corporate-level tax on the built-in capital gains from the securities. The board voted to pursue DGI's purchase offer, and negotiations over the terms of the sale continued through the spring and summer of 2002. The negotiations show deliberate consideration of tax issues, the proposal to structure the transaction as a two-step merger, discussions over the classification of the first step of the merger as a nontaxable event for Old Capital, and agreement to report the first step as an F reorganization. Throughout this process, the board sought advice from the RYP attorneys on the shareholders' potential tax liability from a sale to DGI. Mr. Lauwers and Mr. Ardinger

[*14] recommended structuring the purchase as a merger to minimize tax and regulatory issues and recommended that DGI form a new company to purchase Old Capital's stock, advising that such a structure could address concerns with the continuity of business enterprise requirement of section 1.368-1(d)(1), Income Tax Regs. DGI's tax counsel advised that the first step of the merger would qualify as an F reorganization.

In a September 2002 email to Old Capital's shareholders Mr. Gesen explained that the divestiture transaction would likely occur through a merger and Old Capital would not report the built-in capital gains on the securities. Old Capital's shareholders unanimously approved the merger. If a shareholder had dissented, he would not have had the right to retain his Old Capital stock. The proxy statement sent to Old Capital's shareholders sought approval of both steps of the merger. It stated that the merger agreement contemplated that the merger of Old Capital into petitioner would be a nontaxable F reorganization under section 368(a)(1)(F) and that each share of Old Capital would convert into a share of petitioner. It further stated that outside tax counsel had advised that the first step should be treated as a nontaxable F reorganization. It further stated that petitioner agreed to file its tax returns in accordance with the classification of the merger as an F reorganization.

[*15] At petitioner's incorporation, Mr. Gesen was its president, secretary, treasurer, and sole board member. After the merger, Mr. Haber was petitioner's president. Mr. Haber was also the president of CF Acquisition and CF Merger.

V.     Merger Agreement

On November 13, 2002, petitioner, Old Capital, CF Acquisition, and CF Merger executed a merger agreement and an amendment to the merger agreement for the terms of both steps of the merger. Pursuant to the merger agreement, Old Capital terminated its insurance license and entered into agreements that discharged its insurance obligations. Petitioner has never held an insurance license and has not engaged in any insurance activities.

Pursuant to the merger agreement, upon the first step of the merger (Old Capital with petitioner) each share of Old Capital would automatically convert into a share of petitioner and Old Capital's stock certificates would be deemed to represent shares in petitioner. Old Capital's shareholders were not issued stock in petitioner. Upon the second step of the merger (CF Merger into petitioner) Old Capital's shareholders would receive cash consideration as defined in the merger agreement in exchange for their shares in petitioner. In substance, the cash consideration came from the sale of Old Capital's securities facilitated through an acquisition loan. The merger consideration was $13.5 million computed under the

[*16] formula of the sum of 100% of Old Capital's cash and 92.5% of the fair market value of its securities on the merger date. Upon the second step of the merger, each share of CF Merger, which was wholly owned by CF Acquisition, would automatically convert into a share of petitioner. After the two steps of the merger, CF Acquisition wholly owned petitioner.

The merger agreement stated that the parties intended for the first step to constitute a nontaxable F reorganization and agreed to report the merger as such for tax purposes. To this end, the merger agreement addressed the requirements of an F reorganization including a "Continuity of Business Enterprise" provision in which Old Capital and petitioner represented and warranted that petitioner "operates at least one significant historic business line, or owns at least a significant portion of Target's [Old Capital's] historic business assets" and CF Merger and CF Acquisition represented and warranted that they "presently intend to continue at least one significant historic business line of Target after the Second Merger * * * or to use at least a significant portion of Target's historic business assets in a business" and CF Acquisition "will continue at least one significant historic business line of Target, or use at least a significant portion of Target's historic business assets". In other sections of the merger agreement, the parties

[*17] represented and warranted that CF Acquisition and CF Merger did not intend to operate petitioner as an insurance company.

Under the merger agreement, petitioner agreed to timely file all required tax returns to "properly report the transactions consummated pursuant to this Agreement and properly reflect the tax treatment intended by the Parties". The merger agreement further provided that any amended return or refund claim would not be inconsistent with the intended treatment of the first step of the merger as an F reorganization and the second step as a sale of petitioner's stock to CF Acquisition. It did not expressly prohibit petitioner from taking a position in litigation, such as the present one, that the first step of the merger was not an F reorganization so long as petitioner did not file a refund claim or an amended return.

Old Capital's merger into petitioner required approval from NHID. In his correspondence with NHID requesting approval, Mr. Lauwers represented that the merger would terminate Old Capital's existence as an insurance company. He further represented that DGI was not interested in owning or operating an insurance business and was primarily interested in purchasing Old Capital's securities. He represented that the merger was necessary to accomplish the sale of Old Capital to DGI, petitioner was incorporated for the purpose of effecting the

**[*18]** merger, and the merger of Old Capital into petitioner would be nontaxable. On November 27, 2002, NHID approved the merger and ordered the termination of Old Capital's existence as an insurance company effective on the merger date.

Petitioner also sought an exemption from certain State corporate filing requirements for the first step of the merger on the basis that it was merely an interim step of the two-step merger. It represented that "[i]n substance, the transaction is a cash merger" and further represented that the sale of Old Capital was structured as a two-step merger to achieve certain tax objectives and terminate Old Capital's insurance business. Finally, it represented that it would not issue stock certificates to Old Capital's shareholders.

DGI financed the purchase of Old Capital's stock with a $16.5 million acquisition loan issued to CF Acquisition. In a letter soliciting the loan, DGI represented that Old Capital owned cash and securities worth approximately $18 million and estimated that the loan would be outstanding for three days. DGI pledged Old Capital's securities as collateral and agreed to obtain a firm commitment for the sale of the securities before it received the loan proceeds and use the sale proceeds to repay the loan. For the loan approval, the lending bank prepared a credit report on CF Acquisition that stated Old Capital's securities would be sold as soon as CF Acquisition purchased Old Capital's stock with the

[*19] loan proceeds pursuant to a fixed price contract.  The credit report further stated that CF Acquisition would immediately use the sale proceeds to repay the loan.

## VI.    Audit and Notices of Deficiency

In January 2006 respondent began an audit for petitioner's 2002 tax year. Revenue Agent (RA) Richard Davis was assigned to the audit, and Joni Politzer, a tax shelter technical advisor, was assigned to assist him.  By letter dated April 18, 2006, RA Davis informed petitioner of the audit and requested a meeting. Petitioner did not respond to this letter, refused delivery of other correspondence, and did not cooperate with the audit.  The initial focus of the audit was whether petitioner engaged in a tax shelter transaction through the SPX options.  During the audit, respondent had a copy of the Northmoy stock purchase agreement that he obtained from a third party, which is the basis for petitioner's SPX loss deductions.  The audit did not consider the structure of the merger or whether any part of the merger transaction was taxable event.

During the course of the audit, RA Davis and Ms. Politzer had minimal information about the merger.  They did not have a copy of the merger agreement. They were not aware that the merger occurred in two steps.  They understood that Old Capital stock was sold to CF Acquisition and then Old Capital merged with

[*20] petitioner. Thus, they understood that CF Acquisition was the owner of petitioner before and after the merger. RA Davis and Ms. Politzer did not know or have any reason to know that there was a second step of the merger. There is no indication that the revenue agents questioned whether it was correct for petitioner to report the merger of petitioner and Old Capital as nontaxable or considered what position petitioner was taking to support its reporting of the merger as nontaxable, or whether the merger was an F reorganization.

On September 11, 2006, respondent issued a notice of deficiency to petitioner for the 2002 tax year disallowing the deductions for the SPX option loss, consulting fees, and interest expense. Respondent did not adjust petitioner's reported capital gain from the sale of Old Capital's securities. On the basis of respondent's adjustments, petitioner's taxable income increased by the amount of its reported capital gain. Respondent received a copy of the merger agreement in November 2006. After issuance of the deficiency notice, petitioner failed to comply with a summons issued by respondent, and respondent sent a "last-chance" letter to petitioner advising that legal proceedings might be brought for continued noncompliance with the summons.

In 2012, after discovery in this case, respondent opened an audit for Old Capital's 2002 tax year and prepared a substitute for return for Old Capital for that

[*21] year.  On July 25, 2012, respondent issued a notice of deficiency to Old

Capital for 2002 determining that Old Capital was required to file a return for its

2002 tax year ending on the merger date.  He also determined that its merger with

petitioner did not qualify as an F reorganization and Old Capital realized capital

gains on the deemed sale of the securities to petitioner on the merger date.

Petitioner, as successor in interest to Old Capital, filed a petition with this Court

assigned docket no. 25858-12.  In New Capital Fire, Inc. v. Commissioner (New

Capital), T.C. Memo. 2017-177, we held that the notice of deficiency issued to

Old Capital was untimely and the statute of limitations barred assessment against

Old Capital for 2002.  In that case, petitioner argued that the first step of the

merger qualified as an F reorganization.  We did not reach the merits of that issue.

After our decision in New Capital had become final, petitioner filed an

amended petition in this case alleging that it did not realize the capital gains from

Old Capital's securities that it had reported on its 2002 return.  In the amended

petition, petitioner adopted the substantive position that respondent asserted

against Old Capital in New Capital:  The first step of the merger did not qualify as

an F reorganization, Old Capital realized capital gains from a deemed sale of the

securities on the merger date, petitioner received a basis in the securities equal to

[*22] their fair market value on the merger date, and thus it did not have the gain it reported on the sale of the securities.

In the amended petition, petitioner alleged that respondent erred in determining that petitioner had realized the capital gains of approximately $7.8 million that petitioner had reported on its 2002 return. In a stipulation of settled issues filed November 5, 2018, petitioner conceded that respondent did not adjust petitioner's reported capital gains in the notice of deficiency. The notice of deficiency reflected an adjustment to income of $7.8 million on the basis of respondent's determination to disallow the capital loss deductions from the SPX options.

## Discussion

Respondent argues that petitioner is estopped under the duty of consistency or the doctrine of equitable estoppel from changing its reporting of the capital gains after the period of limitations expired for Old Capital's 2002 tax year. He argues that we should not permit petitioner to treat the merger of petitioner and Old Capital as a taxable event.[2] Had petitioner treated the merger as taxable, it

---

[2] Petitioner argues that respondent should be barred from raising the doctrine of equitable estoppel because he did not clearly indicate his intent to assert that doctrine in his discovery responses. Such an argument is without merit and does not warrant further discussion. Respondent alleged the doctrine in his answer to
(continued...)

[*23] would have reported the bases in the Old Capital securities equal to their fair market values on the merger date, at or near their sale prices, and would have had minimal or no capital gains on the sales. Therefore, respondent argues that we should not allow petitioner to argue that Old Capital should have recognized capital gains on the deemed sale of the securities on the merger date and that petitioner had bases in the securities equal to their fair market values on the merger date.

## I.     Background on F Reorganizations

Section 1001 requires taxpayers to recognize any gain or loss realized on the sale or exchange of property unless an exception exists. One such exception is an F reorganization under section 368(a)(1)(F). An F reorganization is defined as a "mere change in identity, form, or place of organization of one corporation, however effected". Sec. 368(a)(1)(F). An F reorganization

> encompass[es] only the simplest and least significant of corporate changes * * * [and] presumes that the surviving corporation is the same corporation as the predecessor in every respect, except for minor or technical differences * * * [It] typically has been understood to comprehend only such insignificant modifications as the

---

[2](...continued)
petitioner's amended petition. There is no basis for petitioner to claim unfair prejudice or undue surprise by respondent's assertion of equitable estoppel in this fully stipulated case.

[*24] reincorporation of the same corporate business with the same assets and the same stockholders * * *

Berghash v. Commissioner, 43 T.C. 743, 752 (1965), aff'd, 361 F.2d 257 (2d Cir. 1966).

To qualify, the reorganization must occur pursuant to a plan of reorganization, have a valid business purpose, and have continuity of business enterprise and continuity of interest.[3] Sec. 1.368-1(c), (d), and (e), Income Tax Regs. Continuity of business enterprise generally requires the surviving corporation to continue at least one line of the target's historic business or use a significant portion of the target's historic business assets in a business after the reorganization, and continuity of interest generally requires a substantial portion of the target's shareholders to have a continuing ownership interest in the successor corporation after the reorganization. Id. paras. (d)(1), (e).

In an F reorganization the target's tax year does not terminate on the reorganization and the surviving corporation must file a full-year return on the basis of a single tax year that includes the operations of the target before the reorganization and the surviving corporation for the remainder of the year. Sec.

---

[3]The F reorganization regulations were amended after the merger date to eliminate the continuity of business enterprise and continuity of interest requirements. Sec. 1.368-1(b), Income Tax Regs.; T.D. 9182, 2005-1 C.B. 713.

[*25] 381(b); <u>New Capital</u>, at *6; sec. 1.381(b)-1(a)(2), Income Tax Regs.

Significant for this case, the transfer of the target's assets to the successor

corporation in an F reorganization is not a taxable disposition. When a transaction

does not qualify as an F reorganization, the target must recognize gain on its assets

as if it had sold the assets to the surviving corporation for their fair market values.

<u>Honbarrier v. Commissioner</u>, 115 T.C. 300, 315 (2000); Rev. Rul. 69-6, 1969-1

C.B. 104.

Petitioner maintains that we should treat the two steps of the merger as two

separate transactions.[4] We do not decide this issue as the parties agree the first

step of the merger was not an F reorganization. For convenience, we refer to the

first step as the first merger for the remainder of this opinion and the second step

as the second merger. The parties address at length how the first merger failed to

qualify as an F reorganization. We consider below the terms of the first merger as

it relates to the requirements of an F reorganization for purposes of ascertaining

whether petitioner misrepresented material facts. Significantly, the return did not

accurately disclose the entire transaction and did not disclose that there were two

---

[4]Petitioner argues that the first merger had a business purpose, to terminate the insurance license. However, the termination of the insurance license was required only to accomplish the entire transaction. Petitioner knew that there was no purpose for the transaction except tax avoidance.

[*26] mergers.  Petitioner chose to disclose only the first merger and did not make adequate disclosures of that merger.

II.    Estoppel

Respondent argues that we should apply the doctrine of equitable estoppel or the duty of consistency to preclude petitioner from asserting that it did not realize gain on the sale of Old Capital's marketable securities.  Petitioner argues that the Court of Appeals for the Second Circuit, to which this case is appealable, does not recognize a duty of consistency.  Respondent argues that the Court of Appeals would recognize a duty of consistency under the particular circumstances of this case, namely, that petitioner did not make an innocent mistake and is seeking to change its own reporting through an amended petition.  As explained below, we find that equitable estoppel applies here and we do not apply the duty of consistency.

The Supreme Court has long recognized that the doctrine of equitable estoppel applies in tax cases.  See R.H. Stearns Co. of Bos., Mass. v. United States, 291 U.S. 54 (1934).  In holding the taxpayer estopped from obtaining a refund, the Supreme Court stated:  "[N]o one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong."  Id. at 61-62.  The Court of Appeals for the Second Circuit has stated that "equity plays a very

**[\*27]** limited role in tax cases." Callaway v. Commissioner, 231 F.3d 106, 134 (2d Cir. 2000), rev'g T.C. Memo. 1998-99. It has applied the doctrine of equitable estoppel to tax issues. See, e.g., United States v. Wynshaw, 697 F.2d 85, 87 (2d Cir. 1983); United States v. Matheson, 532 F.2d 809, 819 (2d Cir. 1976); Askin & Marine Co. v. Commissioner, 66 F.2d 776, 778 (2d Cir. 1933), aff'g 26 B.T.A. 409 (1932). The duty of consistency, also referred to as quasi-estoppel, originates in similar principles of equity but is seen as having broader application than equitable estoppel. See, e.g., Estate of Ashman v. Commissioner, 231 F.3d 541, 543 (9th Cir. 2000), aff'g T.C. Memo. 1998-145; Estate of Letts v. Commissioner, 109 T.C. 290, 296 (1997), aff'd without published opinion, 212 F.3d 600 (11th Cir. 2000). Both doctrines are affirmative defenses. S. Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 838 (1980); McCulloch Corp. v. Commissioner, T.C. Memo. 1984-422. The party asserting them bears the burden of proof. Rule 142(a).

The Court of Appeals for the Second Circuit has identified four requirements for applying equitable estoppel against a taxpayer: (1) the taxpayer made a false representation or engaged in a wrongful misleading silence, (2) the error originated in a statement of fact and was not a mistake of law, (3) the Commissioner did not know the correct facts, and (4) the Commissioner is

**[*28]** adversely affected by the taxpayer's acts or statements. <u>Lignos v. United States</u>, 439 F.2d 1365, 1368 (2d Cir. 1971); <u>see</u> <u>Stair v. United States</u>, 516 F.2d 560, 564 (2d Cir. 1975) (citing <u>Lignos</u>). Equitable estoppel can apply to bind a taxpayer to a representation made by another taxpayer where the two taxpayers are in privity, i.e., where there is sufficient identity of interests between them. <u>Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC</u>, 692 F.3d 983, 996 (9th Cir. 2012); <u>see</u> <u>Estate of Letts v. Commissioner</u>, 109 T.C. at 298 (stating the duty of consistency applies to taxpayers that are in privity); <u>see also</u> <u>Ag Processing, Inc. v. Commissioner</u>, 153 T.C. 34, 55-56 (2019) (dismissing the Commissioner's argument to apply the duty of consistency "to one taxpayer where the period of limitations has expired with respect to a different taxpayer"). Petitioner concedes that it was in privity with Old Capital for the 2002 tax year.

Respondent argues that the requirements of both equitable estoppel and the duty of consistency are met here. Under the duty of consistency, the Commissioner may treat the taxpayer's representations with respect to a prior, closed tax year as true and estop the taxpayer from asserting a contrary position in a subsequent year regardless of whether the earlier position was correct. <u>Herrington v. Commissioner</u>, 854 F.2d 755, 758 (5th Cir. 1988), <u>aff'g</u> <u>Glass v. Commissioner</u>, 87 T.C. 1087 (1986); <u>Estate of Letts v. Commissioner</u>, 109 T.C.

**[\*29]** at 297. Applying duty of consistency requires that the Commissioner acquiesced in or relied on the representation made for the closed year but does not examine whether the misrepresentation was innocently or intentionally made. Beltzer v. United States, 495 F.2d 211, 212 (8th Cir. 1974) (applying a duty of consistency where the taxpayer's mistake is "innocent or otherwise"); Estate of Letts v. Commissioner, 109 T.C. at 297. Courts have recognized their respective applicability to an innocent mistake as the primary difference between the two doctrines. Equitable estoppel would not apply to an innocent mistake. LeFever v. Commissioner, 100 F.3d 778, 786 (10th Cir. 1996), aff'g 103 T.C. 525 (1994). In LeFever, the court stated that equitable estoppel requires "a showing that the taxpayer made an intentional misrepresentation". Id.

The Court of Appeals for the Second Circuit has been reluctant to expand the reach of equitable considerations to adopt a duty of consistency. See Uinta Livestock Corp. v. United States, 355 F.2d 761, 766 (10th Cir. 1966) (stating that the Second Circuit "adhered to a more strict reading of the * * * estoppel elements"); Zuhovitzky v. Commissioner, T.C. Memo. 2018-158, at *7 n.5 (stating that the Second Circuit "does not seem to recognize the duty of consistency"). But see Unvert v. Commissioner, 72 T.C. 810, 815 (1979) (citing the Second Circuit

[*30] case of <u>Askin & Marine Co.</u> as recognizing a duty of consistency), <u>aff'd</u>, 656 F.2d 483 (9th Cir. 1981).

Petitioner cites the following cases to argue that the Court of Appeals for Second Circuit does not recognize a duty of consistency, the most recent of which was decided nearly 70 years ago: <u>Commissioner v. Dwyer</u>, 203 F.2d 522, 524-525 (2d Cir. 1953); <u>Bennet v. Helvering</u>, 137 F.2d 537, 539 (2d Cir. 1943); <u>Helvering v. Schine Chain Theatres, Inc.</u>, 121 F.2d 948 (2d Cir. 1941); and <u>Helvering v. Brooklyn City R. Co.</u>, 72 F.2d 274 (2d Cir. 1934), <u>aff'g</u> 27 B.T.A. 77 (1932). The most recent case to raise the duty of consistency before the Court of Appeals for the Second Circuit is <u>Janis v. Commissioner</u>, 469 F.3d 256 (2d Cir. 2006), <u>aff'g</u> T.C. Memo. 2004-117, in which the taxpayer challenged our application of a duty of consistency between an estate and its heirs with respect to basis in inherited property. The Court of Appeals affirmed "for different reasons" on the basis of the technical requirements of the law that an heir's basis in inherited property be the fair market value properly determined for purposes of estate tax.[5] <u>Id.</u> at 257,

---

[5]Our decision was also appealed by another heir to the Court of Appeals for the Ninth Circuit, which affirmed on the basis of the duty of consistency. <u>Janis v. Commissioner</u>, 461 F.3d 1080, 1085-1087 (9th Cir. 2006), <u>aff'g</u> T.C. Memo. 2004-117.

**[*31]** 261. Notably, the Court of Appeals did not address the applicability of a duty of consistency or otherwise indicate its position with respect to such a duty.

Bennet is often cited for the proposition that the Court of Appeals for the Second Circuit does not recognize a taxpayer's duty of consistency. Petitioner also relies on that case. In Bennet v. Helvering, 137 F.2d at 538, the court stated: "We can see no reason why an innocent mistake should deprive the taxpayer of protection" of the statute of limitations. It reasoned that statutes of limitations "presuppose that the original decision may have been erroneous." Id. Bennet was a deficiency proceeding. The Commissioner disallowed a loss deduction for worthless stock that the taxpayer had received as compensation in a prior year, arguing that the taxpayer had no basis in the stock because he had not reported the stock as income when he received it 14 years before. Id.; see Alsop v. Commissioner, 290 F.2d 726, 728 (2d Cir. 1961), aff'g 34 T.C. 606 (1960). In rejecting the Commissioner's arguments for estoppel, the Court of Appeals for the Second Circuit also opined that the Commissioner was equitably in a weaker position in a deficiency proceeding than in refund cases. Bennet v. Helvering, 137 F.2d at 539. The court also explained that there was no indication that the tax from a denial of a deduction would equal the tax if the income had been reported

[*32] for the prior year.  Id.  But see Estate of Ashman v. Commissioner, 231 F.3d

at 544 (questioning the underpinnings of Bennet).

The Court of Appeals for the Second Circuit later explained in

Commissioner v. Dwyer, 203 F.2d at 524-525:

> Although there have been exceptions, it is established by the great
> weight of authority that, if a taxpayer has not misrepresented or
> suppressed the facts, the statute of limitations not only prevents any
> reassessment of the tax after the prescribed period has passed; but that
> the Treasury may not assess a tax for a later year to make up for a
> credit erroneously allowed, or a charge erroneously omitted, in an
> earlier year. * * *

On the basis of Bennet v. Helvering, 137 F.2d at 538, we accept for

purposes of this case petitioner's position that that Court of Appeals would not

apply equitable principles to estop a taxpayer who has made an innocent mistake.[6]

However, the Court of Appeals has applied equitable principles to estop taxpayers

who have knowingly misrepresented facts.  See Matheson, 532 F.2d at 819-820

(estopping an estate from denying the decedent was a U.S. citizen where the

---

[6]The last time that the Court of Appeals for the Second Circuit cited Bennet
was in Alsop v. Commissioner, 290 F.2d 726 (2d Cir. 1961), aff'g 34 T.C. 606
(1960).  It stated that our decision in that case could not be reconciled with
Bennet, distinguished Bennet, and affirmed on other grounds without relying on a
duty of consistency or equitable estoppel.  Alsop involved a taxpayer who claimed
a loss deduction for embezzled income.  The court held that the taxpayer was not
entitled to a loss deduction because the taxpayer had not received the embezzled
money and had not reported it as income.

**[\*33]** decedent knowingly represented her U.S. citizenship to obtain benefits of citizen and did not innocently misunderstand the law); Askin & Marine Co. v. Commissioner, 66 F.2d at 778 (applying principles of equitable estoppel so that "a taxpayer may not benefit at the expense of the government by misrepresenting facts under oath").

We believe that equitable estoppel applies in this case because petitioner knowingly misrepresented facts relating to the first merger and concealed that the merger occurred in two steps, petitioner's misrepresentations were not innocent, and respondent did not know or have reason to know the correct facts before the limitations period expired for Old Capital's 2002 tax year. Petitioner also misled respondent through wrongful misleading silence including Old Capital's not filing a separate return for its 2002 tax year. Petitioner's misrepresentations related to questions of fact; it did not make a mistake of law. Respondent reasonably relied on petitioner's misrepresentations and silence and has been adversely affected.

A.      Misrepresentation of Fact or Misleading Silence

The Court of Appeals for the Second Circuit recognizes the doctrine of equitable estoppel where "[t]he taxpayer, by his conduct, which includes language, acts or silence, knowingly makes a representation or conceals material facts which he intends or expects will be acted upon by taxing officials in determining his

[*34] tax." Wynshaw, 697 F.2d at 87 (quoting Robinson v. Commissioner, 100 F.2d 847, 849 (6th Cir. 1939)). In Wynshaw, the Court of Appeals applied equitable estoppel against a taxpayer in a collection action to preclude her from claiming the signature on her joint return was not hers where she had previously represented in a separate court proceeding that it was her signature. See Matheson, 532 F.2d at 820 (applying equitable estoppel on the basis of the "deliberate and devious nature" of the taxpayer's misrepresentation); Bennet v. Helvering, 137 F.2d at 538 (differentiating an "innocent" mistake from one "consciously made"). The Court of Appeals has previously declined to estop a taxpayer who made an innocent mistake of fact from correcting the mistake in a subsequent year. Bennet v. Helvering, 137 F.2d at 538.

"[A] taxpayer's treatment of an item on a return can be a representation that facts exist which are consistent with how the taxpayer reports the item on the return." Estate of Letts v. Commissioner, 109 T.C. at 299-300; see Becker v. Bemis, 104 F.2d 871, 875 (8th Cir. 1939) (holding that a taxpayer's claimed deductions were "an assertion * * * [of] the facts upon which the claims for deductions were based"). Likewise, the failure to report an item of income may be treated as a representation of the underlying facts of that item's tax effect. Estate of Letts v. Commissioner, 109 T.C. at 300. Failure to report income from a

[*35] transaction is a representation that the transaction is nontaxable. Crane v. Commissioner, 68 F.2d 640, 641 (1st Cir. 1934), aff'g 37 B.T.A. 360 (1932); Bartel v. Commissioner, 54 T.C. 25 (1970). A taxpayer's reporting of the loss leg of a straddle is a factual representation that the straddle had economic substance. Herrington v. Commissioner, 854 F.2d at 758; see also Arberg v. Commissioner, T.C. Memo. 2007-244, 2007 WL 2416230 (holding that the reporting of capital gain is a factual representation that the taxpayer owned the investment account).

Petitioner maintains that the correct facts were set out on its return and that it made no factual misrepresentations in its reporting of the first merger. However, petitioner did not set forth the correct facts on its return. Notably, the return did not expressly state that the first merger was nontaxable. In fact, petitioner's return did not identify the basis on which petitioner claimed the merger of petitioner and Old Capital was a nontaxable event. It did not identify section 386(a)(1)(F) as the basis for its nontaxable treatment. Nevertheless, by reporting carryover bases in the Old Capital securities and reporting Old Capital's activities before the merger on a single full-year return, petitioner reported that the first merger was a nontaxable event.

We disagree with petitioner's assertion that the only factual statement that it made on its return was that it was in the business of investment. Petitioner further

[*36] argues that such a misrepresentation of the facts relating to its business activity is immaterial. It argues that its reporting of its business activity as investments does not constitute a knowing false representation of fact because taxpayers are required to identify a business activity on their returns and investment is the most accurate description of its activities from the options available for purposes of return reporting. It argues that any other choice would have been more false. Petitioner appears to argue that because the return requirements forced it to make this false statement, it should not be counted against it. It now argues that it had no business. Despite petitioner's overly imaginative argument, reporting requirements do not excuse petitioner's knowing factual misrepresentation that it was engaged in an investment business and do not render the misrepresentation innocent.

Petitioner knowingly misrepresented its business activity. We infer that it did so to misrepresent the first merger as qualifying as nontaxable. Although petitioner maintains otherwise, its business activity is a material fact. Petitioner concedes that Old Capital engaged in both an investment business and an insurance business. Petitioner never had any intention of continuing Old Capital's investment business and knew when it filed its 2002 return that it would not engage in an investment business. It continued to report its business as investment

[*37] through the 2005 tax year even though it conducted no business activity. On the basis of the transaction documents, it is clear to us that the purpose of petitioner's existence was for Old Capital's shareholders to achieve a tax strategy to avoid a corporate-level tax on the built-in capital gains on Old Capital's securities. The Internal Revenue Service (IRS) had published Notice 2001-16, 2001-1 C.B. 730, before petitioner filed its 2002 tax return; and it is highly unlikely that Mr. Harber was unaware of that Notice or its classification of the intermediary transactions such as the subject transaction as abusive tax shelters.

Petitioner knowingly made numerous factual representations on its return including its claim of carryover bases in Old Capital's securities. As we stated, nowhere on the return did petitioner identify the first merger as an F reorganization or otherwise expressly state it was nontaxable. By claiming the carryover bases it knowingly reported the first merger as a nontaxable event. Petitioner's decision for Old Capital not to file a separate return for the 2002 tax year again represented that facts existed to support treating the first merger as a nontaxable disposition of Old Capital's assets. Instead, petitioner attached a pro forma return for Old Capital to petitioner's return, a further representation that the first merger was a nontaxable transaction. The decision not to file a separate

[*38] return for Old Capital was a conscious and deliberate decision and not an innocent mistake.  It was part of the planned tax avoidance transaction.

Petitioner ignores our caselaw, which holds that a return reporting position is a representation that the facts underlying the income or expense item support such reporting.  By reporting the first merger as nontaxable, petitioner knowingly represented that Old Capital's shareholders continued to own petitioner after the merger.  They did so but only for one hour.  Petitioner argues that the shareholders never held stock in petitioner because petitioner's stock was not actually issued.  However, the merger agreement provided that Old Capital stock automatically converted into petitioner's stock.

Petitioner now asserts that the following material facts represented on its return are not correct:  (1) petitioner was in the investment business, (2) petitioner acquired carryover bases in the Old Capital securities, and (3) Old Capital was not required to file a separate return for 2002.  Petitioner reported that the first merger was nontaxable and in so doing represented that the facts of the first merger were in accordance with such reporting.  In so doing, it made representations that it knew were not the correct facts.  These misrepresentations were not innocent mistakes.  Petitioner knew that neither Old Capital's investment business nor its insurance business would continue and knew that Old Capital's shareholders

[*39] would continue as shareholders for only one hour. Petitioner knew the representations were incorrect.

We further note that in the cases that petitioner cites, the Court of Appeals for the Second Circuit did not use the term "intentional" with respect to the requirement for the misrepresentation. The court requires a knowing representation. Wynshaw, 697 F.2d at 87. Petitioner knew that the first merger did not satisfy the requirements of an F reorganization including the continuity of business enterprise, continuity of interest, or business purpose requirement. Petitioner knew that it would not continue Old Capital's insurance business or its investment business, Old Capital's shareholders owned an interest in petitioner for only one hour and did not own any interest in petitioner or CF Acquisition after the second merger, and Old Capital's shareholders received cash consideration for the stock in petitioner one hour after the first merger.

Petitioner also made factual representations through its failure to disclose material facts. Significantly, it did not disclose on its 2002 return that there was a second merger in which Old Capital's shareholders received cash for their stock in petitioner. Thus, petitioner did not disclose, and respondent was unaware, that Old Capital's shareholders received a cashout. This is a wrongful misleading silence. Petitioner argues that respondent should have suspected that the SPX

[*40] options involved an intermediary transaction and points to the revenue agents' communications with intermediary transaction advisers during the audit. Tax shelters of the type petitioner engaged in traditionally involve intermediary transactions. See Notice 2001-16, supra (identifying listed intermediary transactions as abusive tax shelters).

Petitioner admits on brief that it was a "party to a classic intermediary transaction". However, petitioner's return did not indicate that an intermediary transaction occurred. Petitioner represented a continuity of ownership, which is inconsistent with the second merger, and concealed from respondent the facts that might have indicated that the first merger was a taxable event. Its reporting that CF Acquisition wholly owned petitioner as of the end of the 2002 tax year is not adequate disclosure of the second merger or an intermediary transaction.

Petitioner knowingly misrepresented the facts of the two-step merger and that the first merger was a nontaxable event so that petitioner rather than Old Capital was the taxpayer that reported the capital gains from the prearranged sales of the securities. Petitioner knew that it was misrepresenting material facts so that it could claim the first merger was a nontaxable disposition of Old Capital's assets. It is enough for purposes of equitable estoppel that petitioner knew these factual representations were false, but it also likely knew that the first merger did not

[*41] qualify as an F reorganization. Petitioner's reporting was not an innocent mistake but a deliberate and purposeful representation that was a part of a broader scheme to avoid tax on the built-in gains from Old Capital's securities. Petitioner misrepresented that it was the entity that recognized the capital gains because it engaged in SPX option transactions and attempted to use the SPX option losses to avoid any tax on the capital gains. The IRS subsequently identified the SPX option transactions as an abusive tax shelter referred to as a loss importation transaction in Notice 2007-57, 2007-2 C.B. 87. Petitioner misrepresented that the facts of the first merger supported its reporting as nontaxable to further petitioner's tax avoidance scheme.

The purchase price under the merger agreement was simply a method for Old Capital's shareholders to pay DGI for a tax strategy provided by the SPX option transactions. Petitioner together with Old Capital's shareholders and DGI planned the two-part merger to avoid tax on Old Capital's built-in gains on its portfolio of securities. This was the reason for Old Capital's shareholders' decision to work with DGI. They wanted to avoid corporate-level tax on Old Capital's securities. This was also the reason for petitioner's existence. DGI offered a tax strategy and purposefully structured the transaction so that petitioner would be the entity to sell the securities and recognize the gain because Mr. Haber

[*42] and DGI planned for petitioner to engage in a tax avoidance transaction so that no tax would be reported as owed. An essential part of that plan was for Old Capital and petitioner to treat the first merger as a nontaxable event. There is nothing innocent about petitioner's misstatements or silence. Petitioner's reporting and Old Capital's silence omitted, concealed, and misrepresented the facts of the two-part merger.

To the extent that petitioner argues otherwise, it is irrelevant that petitioner did not initially plan when it filed its 2002 return to later contradict itself. The structure of the two-part merger and the reporting of the first merger as nontaxable were the result of conscious tax planning between Old Capital's shareholders and DGI. In the merger documents, petitioner agreed to report the merger as an F reorganization and thus agreed that it would be the entity to report the capital gains on the securities. It was aware of the tax consequences of such reporting and sought those tax consequences as part of its tax strategy.

The record establishes petitioner's knowledge of its misrepresentation on its return reporting and the lack of any innocence in reporting the first merger as nontaxable as part of a purposefully designed transaction to avoid tax on the capital gains. Old Capital's shareholders wanted to divest themselves of their ownership in a transaction that would minimize corporate- and shareholder-level

[*43] tax.  Mr. Haber offered a tax strategy.  From the beginning, DGI presented its business as designing and selling tax strategies and assisting corporations in solving tax problems.  Mr. Haber, a sophisticated tax adviser with experience in designing tax-motivated transactions, had no intention for petitioner to pay tax on the capital gains but agreed to report the sale of the securities in such a manner that Old Capital's shareholders could also avoid tax.  The parties to the merger sought and negotiated for reporting of the first merger as an F reorganization.  Documents in the record demonstrate the importance of tax considerations in structuring the transaction between DGI and Old Capital, the parties' concern with tax on the capital gains, and assurances to Old Capital's shareholders that the transaction would be structured to avoid corporate-level tax on the built-in capital gains.

We have described Mr. Haber as "a sophisticated tax planner" who has repeatedly attempted to "deliberately exploit[] a perceived loophole" in the tax law.  See Markell Co. v. Commissioner, T.C. Memo. 2014-86, at *38; see also Humboldt Shelby Holding Corp. v. Commissioner, T.C. Memo. 2014-47, at *25, aff'd, 606 F. App'x 20 (2d Cir. 2015).  DGI has a history of deliberate use of tax shelters to help its clients avoid tax.  See, e.g., Diversified Grp. Inc. v. United States, 841 F.3d 975 (Fed. Cir. 2016); Namm Tr. v. Commissioner, T.C. Memo.

**[*44]** 2018-182, at \*4-\*7; <u>Tucker v. Commissioner</u>, T.C. Memo. 2017-183, at \*25, <u>aff'd</u>, 766 F. App'x 132 (5th Cir. 2019); <u>Markell Co. v. Commissioner</u>, T.C. Memo. 2014-86 (involving a son of BOSS tax shelter). Mr. Haber has repeatedly used various option transactions similar to the SPX option transactions to generate artificial losses to offset built-in capital gains on assets held by a target corporation that DGI acquired indirectly through newly formed partnerships and corporations.

Respondent also argues that petitioner's failure to cooperate during the audit of its 2002 return further demonstrates its lack of innocence. The audit file contains RA Davis' statements that petitioner failed to cooperate with the audit, refused to meet with him, and withheld requested information.[7] Withholding requested information during an audit can be wrongful misleading silence. <u>Unvert v. Commissioner</u>, 72 T.C. at 814-818. Even when a taxpayer has innocently misstated facts on a return, equitable estoppel may nevertheless apply where the taxpayer later learns of the mistake but fails to provide the corrected facts to the Commissioner during an audit. <u>Id.</u> at 818. Petitioner objects to RA Davis'

---

[7]For the first time in its reply brief, the third brief it filed, petitioner contends that there is no proof of mailing or receipt of RA Davis' April 18, 2006, letter notifying petitioner of the audit. Petitioner stipulated this letter without reserving an objection.

[*45] description of its conduct as uncooperative. We have not based our findings that petitioner knowingly misrepresented facts on its alleged conduct during the audit. We have found that petitioner deliberately made statements of facts in its reporting that it knew were incorrect. We address petitioner's alleged conduct during the audit below in connection with the requirement that respondent lacked actual or constructive knowledge of the correct facts before the limitations period expired.

B.    Mistake of Law

Equitable estoppel does not apply to a mistake of law. Bennet v. Helvering, 137 F.2d at 539. The Court of Appeals for the Second Circuit has explained its refusal to apply equitable estoppel to a mistake of law, referring to it as "a kind of estoppel as to the law":

> That theory is, not that the taxpayer was here "estopped" as to any fact by his earlier return, but that if the earlier assessment were made upon one theory of law, the same theory must be consistently followed thereafter * * * [E]ven if the taxpayer had no part in inducing that error--justice demands that that assumption shall be carried over into any future year * * * With deference * * * [this theory] seems to us, not only to have all the vices of an estoppel as to the facts, but not to have even the excuse which that doctrine has: i.e., that in making his return a taxpayer does represent that it contains his complete gross income; something which the Commissioner cannot know. * * *

**[\*46]** Id.; see also Crosley Corp. v. United States, 229 F.2d 376 (6th Cir. 1956);

Ag Processing, Inc. v. Commissioner, 153 T.C. at 55-56 (involving an issue of

first impression); S. Pac. Transp. Co. v. Commissioner, 75 T.C. at 560; Garavaglia

v. Commissioner, T.C. Memo. 2011-228, 2011 WL 4448913, aff'd, 521 F. App'x

476 (6th Cir. 2013); McCulloch Corp. v. Commissioner, T.C. Memo. 1984-422.

Courts have applied equitable principles to estop taxpayers who have made false

representations with respect to questions of fact and mixed questions of fact and

law. Eagen v. United States, 80 F.3d 13, 17 (1st Cir. 1996); Herrington v.

Commissioner, 854 F.2d at 758.

Courts have stated that a mistake of law occurs when both parties have

knowledge of all relevant facts before the period of limitations expired. See

Crosley Corp., 229 F.2d at 381 (holding that a business expense deduction for a

tool with a three-year useful life was a mutual mistake of law where the

Commissioner knew the facts related to the deduction from an audit for the prior

year); Garavaglia v. Commissioner, 2011 WL 4448913, at *18 (refusing to apply

the duty of consistency to require the taxpayer to treat a corporation as an S

corporation where the Commissioner knew the election form was incomplete and

thus invalid). However, the Court of Appeals for the Second Circuit considers the

**[*47]** Commissioner's knowledge a separate requirement under the doctrine of equitable estoppel.

Petitioner argues that if it did make any misstatements, they were mistakes of law and not mistakes of fact. It argues that whether the first merger qualifies as an F reorganization is a question of law. We disagree. Whether a merger qualifies as an F reorganization depends on whether the circumstances and terms of the merger satisfy the legal requirements of the Code and the regulations. Each requirement set forth in the Code and the regulations for an F reorganization is predicated on questions of fact. The issue is a question of fact or a mixed question of fact and law. For example, the continuity of interest requirement is a question of fact. See Russell v. Commissioner, 832 F.2d 349, 352 (6th Cir. 1987), aff'g T.C. Memo. 1986-150. Likewise, the existence of a plan of reorganization is "a pure question of fact". Swanson v. United States, 479 F.2d 539, 545 (9th Cir. 1973). Whether the taxpayer had a business purpose for the merger is also a question of fact. Lewis v. Commissioner, 160 F.2d 839, 844 (1st Cir. 1947) (distinguishing the question of whether a business purpose is required, a question of law, from whether the taxpayer had a business purpose, a question of fact), vacating 6 T.C. 455 (1946). The propriety of classifying the merger as an F reorganization involves applying the law to the facts. Petitioner's mistake is one

[*48] of fact or a mixed question of fact and law to which equitable estoppel may apply. See LeFever v. Commissioner, 100 F.3d at 788. All parties to the merger agreement understood the law and were concerned with representing to respondent that the first merger was nontaxable.

Petitioner relies heavily on Manhattan Bldg. Co. v. Commissioner, 27 T.C. 1032 (1957), to argue that the tax treatment of the first merger is a question of law. However, the case does not support petitioner's position. Rather, it stands for the proposition that there is no basis for equitable estoppel when the Commissioner has knowledge of the facts. Manhattan Bldg. Co. involved a taxpayer who for a prior, closed year erroneously treated a transfer of real property as nontaxable under the predecessor to section 351. The Commissioner had audited the prior year's return and did not adjust the claimed carryover basis. Id. at 1037, 1039, 1041-1042. On the sale of the real property nearly 20 years later, the taxpayer argued that the prior transfer was taxable and that it did not receive a carryover basis for purposes of calculating its gain or loss on the sale of the property. We held that equitable estoppel did not require the taxpayer to use the carryover basis. We stated repeatedly in our Opinion that the Commissioner was aware of the facts and on the basis of that knowledge there was no evidence of any misrepresentation by the taxpayer or evidence that the Commissioner was misled. Id. at 1041-1043.

**[\*49]** The proper treatment of a merger as taxable or nontaxable primarily affects the acquiring corporation's bases in the target's assets. The regulations addressing adjustments to basis require that principles of equitable estoppel apply in determining basis and adjustments to basis. See sec. 1.1016-6(b), Income Tax Regs. Petitioner sold the securities and must report the sales. The issue is the amount of gain that petitioner realized on the sales, which depends on whether petitioner received carryover bases in Old Capital's securities from an F reorganization or bases equal to the securities' fair market values on the merger date, in which case the sales days after the merger would not likely result in any gain. Equitable estoppel is appropriate with respect to the basis issues involved here.

C.    Respondent's Knowledge

The Court of Appeals for the Second Circuit has declined to apply equitable estoppel where the Commissioner had actual or constructive knowledge of the correct facts while the prior year was open. Lignos v. United States, 439 F.2d at 1368; Helvering v. Brooklyn City R. Co., 72 F.2d at 275 (refusing to apply equitable estoppel where the Commissioner had "immediate access" to the taxpayer's books and records); see Ross v. Commissioner, 169 F.2d 483 (1st Cir. 1948) (a case cited by petitioner, refusing to apply equitable principles where the

[*50] Commissioner was fully aware of the facts shortly after they occurred and substantially before the statute of limitations barred assessment).

As stated above, courts characterize a taxpayer's error to be a mistake of law, rather than fact, where the Commissioner had knowledge of the correct facts while the prior year was open. Unvert v. Commissioner, 72 T.C. at 816 (stating that before a mutual mistake of law can occur, both parties must know the facts). The Commissioner is not entitled to equitable estoppel where the Commissioner had knowledge of the material facts while the prior year was open but did not make an adjustment to correct the taxpayer's error in reporting. See Crosley Corp., 229 F.2d at 377-378, 380-381 (finding that the Commissioner had knowledge that the cost of a tool should have been capitalized and the taxpayer was not entitled to the claimed business expense deduction); Garavaglia v. Commissioner, 2011 WL 4448913, at *16-*18 (finding that the Commissioner knew that an S corporation election was incomplete and thus invalid); Estate of Posner v. Commissioner, T.C. Memo. 2004-112 (finding that the Commissioner knew of the error where a decedent's will was attached to the estate tax return filed in the prior, closed year).

For purposes of equitable estoppel, the Commissioner is entitled to rely on the presumption of correctness of a return, i.e., the factual representations on a

[*51] return signed under penalties of perjury. The Commissioner acquiesces or relies on a taxpayer's reporting of an item when the Commissioner accepts a return as filed and allows the period of limitations to expire. Herrington v. Commissioner, 854 F.2d at 758; Estate of Letts v. Commissioner, 109 T.C. at 300. However, the taxpayer's "misstatement must be one on which the government reasonably relied, in the sense that it neither knew, nor ought to have known, the true nature of the transaction mischaracterized by the taxpayer." Lewis v. Commissioner, 18 F.3d 20, 26 (1st Cir. 1994), vacating and remanding T.C. Memo. 1992-391; see also United States v. Boccanfuso, 882 F.2d 666, 670 (2d Cir. 1989) (requiring a taxpayer's reliance on any Government misrepresentation to be reasonable).

The Commissioner is not required to audit a return or to examine every representation made by a taxpayer on an audited return. Estate of Letts v. Commissioner, 109 T.C. at 300-301; Arberg v. Commissioner, 2007 WL 2416230, at *13; see Commissioner v. Liberty Bank & Tr. Co., 59 F.2d 320, 325 (6th Cir. 1932), rev'g on other grounds 14 B.T.A. 1428 (1929). However, the Commissioner is not entitled to equitable estoppel where the material facts were readily available to him through adequate disclosure on the return or obtained through an audit. Crosley Corp., 229 F.2d 376; Unvert v. Commissioner, 72 T.C.

**[*52]** at 816, <u>Mayfair Minerals, Inc. v. Commissioner</u>, 56 T.C. 82, 93 (1971), <u>aff'd</u>

<u>per curiam</u>, 456 F.2d 622 (5th Cir. 1972); <u>Faidley v. Commissioner</u>, 8 T.C. 1170,

1173 (1947); <u>Garavaglia v. Commissioner</u>, 2011 WL 4448913, at *18.  Thus,

equitable estoppel will not apply against a taxpayer where the Commissioner

audited the return for the prior year, learned about an error or omission, but failed

to correct it.  <u>Helvering v. Schine Chain Theatres, Inc.</u>, 121 F.2d at 949-950;

<u>Gmelin v. Commissioner</u>, T.C. Memo. 1988-338, <u>aff'd without published opinion</u>,

891 F.2d 280 (3d Cir. 1989).

In <u>Helvering v. Schine Chain Theatres, Inc.</u>, 121 F.2d at 948-949, the

taxpayer provided information to the Commissioner about how it calculated and

reported its income from prepaid rents from various leases, specifically providing

an amortization schedule for income recognition during an audit; but the

Commissioner failed to correct the error in the taxpayer's recognition of the rental

income using amortization.  The leases were later canceled, and the Commissioner

determined that the taxpayer was required to report the income remaining

unreported under the amortization schedule in the year of cancellation.  All of the

rental income should have been recognized for the year when received.  There is

no indication in the court's opinion that the taxpayer argued that it should not have

to report the income pursuant to the amortization schedule for the remainder of the

[*53] lease term or sought to avoid tax on the unreported portion of the lease payments.

The Court of Appeals for the Second Circuit held that there was no basis to apply equitable estoppel against the taxpayer because the Commissioner had all the facts and accepted the taxpayer's reporting. Id. at 950. The court reasoned that the Commissioner did not rely on the taxpayer's representations but verified the facts through the audit and reached an independent conclusion that the income should be recognized as reported. Id.; see also Gmelin v. Commissioner, T.C. Memo. 1988-338 (refusing to apply equitable estoppel against a partner where the IRS had audited the partnership return while the prior year was open and made partnership-level adjustments but inadvertently failed to issue a notice of deficiency to the partner).

An audit alone does not preclude equitable estoppel. Rather, the information in the Commissioner's possession is determinative. See Helvering v. Schine Chain Theatres, Inc., 121 F.2d 948; Gmelin v. Commissioner, T.C. Memo. 1988-338. Equitable estoppel is appropriate where the taxpayer failed to provide requested information during the audit or the Commissioner did not obtain the pertinent information until after the period of limitations expired. Unvert v. Commissioner, 72 T.C. at 816. We have had held that the Commissioner did not

**[\*54]** have sufficient knowledge of a reporting error where he learned of facts that suggested that there might have been an issue with the taxpayer's reporting two months before the limitations period expired.  Spencer Med. Assocs. v. Commissioner, T.C. Memo. 1997-130; see Bentley Court II Ltd. P'ship v. Commissioner, T.C. Memo. 2006-113 (holding that a criminal proceeding begun after the limitations period expired does not negate the Commissioner's initial acceptance of the return as filed).

Petitioner argues that respondent knew or should have known the following facts:  (1) petitioner was not an insurance company, did not report premium income, and did not file Form 1120-PC, the required form for insurance companies, (2) Old Capital was an insurance company on the basis that the pro forma return was Form 1120-PC and reported premium income and the term insurance was in Old Capital's name, (3) petitioner acquired Old Capital's securities and immediately sold them, (4) petitioner was newly incorporated, (5) petitioner purchased the Old Capital stock with an acquisition loan, as respondent issued a summons to the lending bank shortly before the limitations period expired, and (6) there was an intermediary transaction.  Petitioner asserts that respondent's actual or constructive knowledge of these facts was sufficient to make him aware that the first merger did not qualify as an F reorganization.  It also

**[*55]** argues that respondent's lack of actual knowledge of the second merger is not material.

Petitioner reported on its return that there was a merger of Old Capital into petitioner. It did not explicitly state that the merger was nontaxable or identify it as an F reorganization. On an attachment to its return, it represented that a merger occurred, i.e., there was a change of the name and a change in the place of incorporation. Use of Form 1120-PC and the term "insurance" in one entity's name are not sufficient disclosures to establish respondent had actual or constructive knowledge that there was no continuity of business enterprise especially in the light of petitioner's concession that Old Capital engaged in two lines of business, insurance and investment. The description of petitioner as a noninsurance company in the attachment to the return does not cause respondent to have knowledge that there was not a continuity of business enterprise. Petitioner described investment management as Old Capital's primary business. Accordingly, termination of the insurance business is not determinative even if we assume that respondent should have been aware of the termination.

Petitioner further represented that it held certain assets. It reported carryover bases in the securities but did not specifically indicate that it claimed carryover bases. Petitioner argues that respondent should have been aware that it

[*56] used claimed carryover bases because it reported acquisition dates that predated its recent incorporation. Even if we assume this knowledge, it supports only constructive knowledge that petitioner claimed it acquired the assets in a nontaxable event. It does not establish knowledge that such a claim by petitioner was incorrect. Moreover, petitioner did not specify that the securities were acquired in the first step of a two-part merger. Reported acquisition dates are not adequate disclosure to hold respondent to actual or constructive knowledge. In the light of the minimal information that respondent had about the first merger and no awareness of the second merger, we do not hold him to actual or constructive knowledge that the first merger failed to qualify as an F reorganization on the basis of the above facts. See Baldwin v. Commissioner, T.C. Memo. 2002-162 (holding the Commissioner's knowledge of a dispute in a divorce proceeding over an entity's ownership is not sufficient to hold him with constructive knowledge that the entity's S corporation election was invalid).

The only relevant fact that petitioner disclosed on the return was that there was a merger of Old Capital into petitioner with petitioner surviving. Reporting of the sale of the securities does not result in constructive knowledge that petitioner did not have any business activity. Regardless of Old Capital's status as a regulated insurance company, petitioner admitted that Old Capital engaged in an

[*57] investment activity as a second line of business. The possibility that respondent may have been aware that petitioner sold substantially all of Old Capital's securities is not sufficient for us to hold respondent to actual or constructive knowledge that petitioner did not intend to operate an investment business or that the first merger was taxable. Petitioner's 2002 return misrepresented that it was in the investment business and reported that it had $13.5 million in assets at the end of the 2002 tax year to engage in such a business. Respondent did not have sufficient information about petitioner's business operations such that he had actual or constructive knowledge that petitioner did not intend to operate an investment business.

Significantly, respondent did not understand the structure of the merger. He was not aware that there was a two-step merger or that the second step occurred one hour after the first or that it occurred at all. Respondent's misunderstanding of the structure of Old Capital's and petitioner's merger was reasonable on the basis of the information that petitioner provided or that was otherwise in respondent's possession. Petitioner argues that the facts that there were two parts to the transaction and that the first merger preceded CF Acquisition's stock acquisition are irrelevant because neither fact is material.

[*58] Respondent's misunderstanding of the structure of the merger was reasonable. Because of petitioner's inadequate disclosures, the revenue agents mistakenly understood that Old Capital's shareholders sold their stock to CF Acquisition before the first merger and CF Acquisition was Old Capital's and petitioner's sole shareholder before the first merger. Notably, the pro forma return stated that no corporation owned more than 50% of Old Capital at the end of its 2002 tax year, which petitioner calls a red flag. We disagree with petitioner's contention that respondent should have known that the stock sale to CF Acquisition could not have occurred before the first merger.

Petitioner further argues that even if it represented that the first merger was an F reorganization, there is no evidence that respondent relied on such a representation because the administrative file does not state such an understanding of petitioner's position. However, this lack of evidence further supports respondent's contention that he did not have sufficient information to understand the structure of the merger and did not consider petitioner's reporting of the first merger as nontaxable during the audit for petitioner's 2002 tax year. The minimal level of disclosure on petitioner's return is not enough to hold respondent to actual or constructive knowledge of the correct structure of the two-step merger. Petitioner's return did not adequately disclose who owned Old Capital or

[*59] petitioner immediately before the first merger.  Respondent did not have actual or constructive knowledge that Old Capital shareholders received cash after the second merger.

During the audit, the only transactional documents that respondent had in his possession were the certificate of merger and documents related to the SPX option transactions.  Respondent did not fully understand the SPX option transactions and suspected that petitioner had engaged in a son of BOSS tax shelter, which typically involves an intermediary transaction.  Petitioner argues that any intermediary transaction is by its nature inconsistent with a nontaxable reorganization.  However, a suspicion of an intermediary transaction is not grounds for holding respondent to actual or constructive knowledge that a second merger or an intermediary transaction occurred.

Respondent did not obtain the material facts during the audit to put him on notice that the first merger was taxable.  He did not learn of the material facts until discovery in this case after Old Capital's 2002 tax year had closed.  Petitioner appears to argue that respondent should have questioned petitioner's reporting of the first step as nontaxable on the basis of his position that the SPX loss transactions were motivated by tax avoidance.  We do not hold respondent to such a standard.  Petitioner's 2002 return disclosed only that a merger of petitioner and

[*60] Old Capital occurred and that petitioner was wholly owned by CF Acquisition at the end of the tax year. Respondent lacked sufficient information to know or have reason to know that petitioner's reporting of the merger as nontaxable was incorrect. In fact, to support its arguments that the first merger did not qualify as an F reorganization, petitioner relies on numerous facts that respondent did not know or have reason to know and documents which respondent did not have in his possession while Old Capital's tax year was open.

Petitioner also denies that it was unresponsive or uncooperative during the audit. The audit file indicates that petitioner failed to respond to RA Davis' request for a meeting, failed to respond to requests for information, and failed to respond to a summons after issuance of the notice of deficiency causing respondent to send a last-chance letter threatening legal action for continued noncompliance. Even if it were true that petitioner fully cooperated with the audit, respondent still did not obtain sufficient information during the audit for us to hold him to actual or constructive knowledge. Furthermore, petitioner incorrectly characterizes the audit as extensive and involving over 45 IRS employees. Two revenue agents were assigned to the audit. The revenue agents consulted with employees in various IRS groups including the technical service unit to prepare and issue the notice of deficiency and the summons and the intermediary

[*61] transactions unit for advice on the SPX option transactions. The Commissioner may rely on a presumption of correctness of a return that is given to him under penalties of perjury. See, e.g., Estate of Letts v. Commissioner, 109 T.C. at 300. More importantly, the Commissioner does not have a duty of investigation to discover information that the taxpayer has not provided. Lofquist Realty Co. v. Commissioner, 102 F.2d 945, 949 (7th Cir. 1939) (holding that the Commissioner is not required to search public records for information that may contradict representations that taxpayers made on their returns or for information omitted from their returns). Nor is the Commissioner treated as having notice of facts that a taxpayer has reported on returns filed for subsequent years. Mayfair Minerals, Inc. v. Commissioner, 56 T.C. at 91.

Finally, petitioner argues that respondent did not rely on the reporting of the merger as nontaxable because he issued a notice of deficiency to Old Capital. It argues that the fact that the notice of deficiency was untimely is irrelevant because respondent already knew the material facts during the audit of petitioner. In New Capital we did not need to address whether respondent was aware of the facts relating to the two-part merger to hold him to actual or constructive knowledge that the first merger was a taxable disposition of Old Capital's assets. Rather, we considered whether petitioner's 2002 return, which included Old Capital's pro

[*62] forma return as an attachment, constituted a return of Old Capital for purposes of the running of the period of limitations under the test set forth in Beard v. Commissioner, 82 T.C. 766 (1984), aff'd, 793 F.2d 139 (6th Cir. 1986). New Capital, at *8-*9.  We held petitioner's 2002 return with the pro forma return was a return of Old Capital and Old Capital did not fail to file a return for purposes of the section 6501(c) exception to the statute of limitations.  We reasoned that even a "misleading" return is a return for purposes of starting the limitations period.  Id. at *7-*8.  The standard for what constitutes a return under the Beard test is not the same as the determination of the Commissioner's constructive knowledge on the basis of the representations on a purported return. Accordingly, our decision in New Capital does not support petitioner's position here.

D.    Respondent Adversely Affected

Equitable estoppel applies only where the Commissioner will be adversely affected by the taxpayer's change in reporting.  Lignos, 439 F.2d at 1368-1369. The Commissioner is adversely affected when a taxpayer changes its reporting after the period of limitations has expired and the change harms the Commissioner.  Id.  We have applied the duty of consistency where taxpayers would obtain an "unfair advantage" by taking inconsistent positions.  Cluck v.

[*63] Commissioner, 105 T.C. 324, 332 (1995).  However, the Court of Appeals for the Second Circuit is more conservative.  In Bennet, the Court of Appeals indicated a need for a tax calculation to determine the harm to the Commissioner. See also Estate of Ashman v. Commissioner, 231 F.3d at 543 (calling the need for a tax calculation "dubious"); Commissioner v. Dwyer, 203 F.2d at 524-525 (allowing taxpayers to take inconsistent positions with respect to ending and beginning inventory, i.e., a double deduction for the same expense).

In Askin & Marine Co. v. Commissioner, 66 F.2d 776, the Court of Appeals applied equitable estoppel where the taxpayer erroneously deducted accounts receivable unpaid at the end of the year as worthless and later collected a portion of the receivables.  The court stated that

> a taxpayer who gets an unlawful deduction in this way not only cuts down his taxable income in the year the deduction is taken, but gets immunity from income taxation on the account receivable which was deducted whenever it, or any part of it, is received.  A result so unjust is not to be reached unless plainly required by the law.  Having represented * * * these accounts * * * to be worthless and having received the benefit of the deduction it claimed when the commissioner took its representation of the ascertainment of worthlessness at its face value, we think the petitioner is now clearly estopped from denying, to the prejudice of the government, the truth of the representations * * *.  [Id. at 778.]

The court went on to explain that "a taxpayer may not benefit at the expense of the government by misrepresenting facts under oath; by succeeding in having

[*64] the commissioner accept its representations as the truth; and by claiming later that what it represented to be true might have been found false had the commissioner refused to have faith in the sworn return." Id.

Petitioner suggests that respondent was not harmed because he conducted an audit for Old Capital's 2002 tax year. It appears to argue that the audit for Old Capital's 2002 tax year, which began after the limitations period expired, and the untimely issuance of a notice of deficiency somehow negate any harm to respondent or any reliance on his part. Respondent decided on an audit for Old Capital's 2002 tax year after he obtained additional information through discovery in this case about the first merger that petitioner had not adequately disclosed on its return. Respondent did not have sufficient information about Old Capital's 2002 tax year to determine that Old Capital should have reported gain from a disposition of the securities on the merger before the limitations period expired. Old Capital's subsequent audit and notice of deficiency are not reason to preclude equitable estoppel against petitioner.

Respondent was adversely affected by petitioner's and Old Capital's reporting. Petitioner filed an amended petition to assert a change from its reporting after the statute of limitations barred assessment of tax for Old Capital's 2002 tax year. This assertion contradicts petitioner's reporting and Old Capital's

[*65] failure to file a return. It is also inconsistent with the position that petitioner asserted in New Capital, where it maintained as an alternative argument that the merger was an F reorganization, an issue we did not consider. Petitioner sought to change its reporting only after our holding that the statute of limitations barred assessment against Old Capital. Petitioner's new position would result in both its and Old Capital's escaping tax on the sale of the securities.

Respondent argues the posture of this case adds to the equities in favor of equitable estoppel. He equates the amended petition to a refund claim. Principles of equitable estoppel first arose in refund claims. In Bennet v. Helvering, 137 F.2d at 538-539, the Court of Appeals for the Second Circuit distinguished R.H. Stearns Co., a refund case, and opined that the Commissioner was equitably in a weaker position in a deficiency proceeding than in a refund case. See also Helvering v. Schine Chain Theatres, Inc., 121 F.2d at 950. The court reasoned that in a refund case fairness justified a setoff for tax owed by the taxpayer even if the statute of limitation barred assessment of the setoff. Bennet v. Helvering, 137 F.2d at 539. Petitioner argues that the amended petition does not have the same equitable considerations as a refund claim because it is not seeking to recover tax that it has already paid. This case is easily distinguishable from Bennet, and the equities weigh in favor of equitable estoppel.

**[\*66]** Equitable estoppel contributes to our system of self-reporting. Cluck v. Commissioner, 105 T.C. at 332. The term "self-assessment" is often used to describe taxpayers' self-reporting of tax on their returns. See sec. 6702(a) (imposing a civil penalty for frivolous tax returns). However, only the Commissioner may assess tax. Sec. 6201(a)(1) (stating that the Secretary shall assess all taxes determined by the taxpayer or the Secretary). When a taxpayer files its return and admits to owing tax, traditionally it has an opportunity to contest such a liability through a refund suit. See sec. 6512(b) (granting the Court authority to consider overpayments in deficiency proceedings).

Respondent is not asserting that petitioner should have reported gains that it failed to report. Petitioner reported the capital gains on its return. Petitioner is attempting to change its own reporting to deny that it realized gains that it previously admitted it recognized. In such a case, equities weigh more heavily against petitioner. Had petitioner not claimed the SPX loss deductions it now concedes, respondent would have been permitted to summarily assess tax on the capital gains within the limitations period in accordance with his practice of assessing the amount of tax reported on a tax return. See sec. 6201(a)(1). He would not have been required to issue a notice of deficiency before the assessment.

**[\*67]** The Court of Appeals for the Second Circuit explained the policy behind

statutes of limitations as follows:

> As a general matter, "[s]tatutes of limitations find their justification in
> necessity and convenience rather than in logic. They represent
> expedients, rather than principles. They are practical and pragmatic
> devices to spare the courts from litigation of stale claims, and the
> citizen from being put to his defense after memories have faded,
> witnesses have died or disappeared, and evidence has been lost."
> * * *

Becker v. IRS (In re Becker), 407 F.3d 89, 96 (2d Cir. 2005) (quoting Chase Sec.

Corp. v. Donaldson, 325 U.S. 304, 314 (1945)). The court further observed that

with respect to tax laws:

> [i]t probably would be all but intolerable, at least Congress has
> regarded it as ill-advised, to have an income tax system under which
> there never would come a day of final settlement and which required
> both the taxpayer and the Government to stand ready forever and a
> day to produce vouchers, prove events, establish values and recall
> details of all that goes into an income tax contest. Hence, a statute of
> limitation is an almost indispensable element of fairness as well as of
> practical administration of an income tax policy.
>
> . . . . Statutes of limitation * * * in their conclusive effects are
> designed to promote justice by preventing surprises through the
> revival of claims that have been allowed to slumber until evidence
> has been lost, memories have faded, and witnesses have disappeared.
> The theory is that even if one has a just claim it is unjust not to put
> the adversary on notice to defend within the period of limitation and
> that the right to be free of stale claims in time comes to prevail over
> the right to prosecute them.

**[\*68]** <u>Id.</u> at 96-97 (quoting <u>Rothensies v. Elec. Storage Battery Co.</u>, 329 U.S. 296, 301 (1946)).

Respondent has not changed his view as to petitioner's reporting of the capital gains. He is not asserting that petitioner has failed to report income. Petitioner is not being asked to defend a stale claim. The policies underlying statutes of limitations are not compromised by estopping petitioner from changing its own reporting. Petitioner reported the capital gains and had the opportunity to preserve the relevant evidence. It is not respondent who is claiming an error occurred. There is no basis for petitioner to claim it is unfairly surprised.

III.    Conclusion

Respondent has established that the requirements for applying equitable estoppel against petitioner are met. The equities clearly weigh in favor of estopping petitioner from changing its return reporting. Accordingly, we decline to let petitioner change its reporting and hold that petitioner had capital gains in the amount it reported on its 2002 return from the sale of Old Capital's securities.

**[\*69]** In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.  To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.